[Crim. No. 11667.    In Bank.    Feb. 13, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES
BRADFORD, JR., Defendant and Appellant.

William R. Freeman, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—Defendant James Bradford, Jr., appeals from a judgment entered upon a jury verdict convicting him of first degree murder (Pen. Code, § 187). In the penalty proceeding the same jury fixed the punishment at death. This appeal is automatic (Pen. Code, § 1239, subd. (b)). We affirm the judgment as to guilt but, under compulsion of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], we reverse as to penalty.

On November 11, 1966, in a remote area of the San Gabriel Mountains north of Glendora, two hunters happened upon the semi-nude body of a woman, subsequently identified as Betty Louise Peace. The hunters promptly notified the Los Angeles Sheriff's office, and after photographs of the body and sur-

rounding scene were taken, the body was removed to the county coroner's office.

The next day Dr. Woodard, a staff member of the coroner's office, performed a postmortem examination of the dead woman. As of November 12, the date of the autopsy, he was of the opinion the woman had been dead at least three days and could have been dead as long as ten days. There were too many variables, he related, to determine with greater precision the date of death. His examination revealed that the woman had sustained two circular skull fractures but these were not, in his judgment, the cause of death. The primary cause of death, he concluded, was chemical burns. He noticed a slight tissue reaction to the burns which would not have occurred had the victim already been dead when the burns were inflicted. Dr. Woodard testified that the woman could not have survived more than 24 hours following the injury. The chemical burns covered about 60 percent of the total body surface and were concentrated about the face and head. He could not tell whether the victim was conscious or unconscious upon receiving the burns; in the event she was conscious, she would have lost consciousness within 15 minutes. A forensic chemist, Dr. Comp. examined several articles found near the body and uncovered traces of sulphuric acid. It is undisputed that a substantial amount of sulphuric acid had been applied to the victim's body.

Circumstantial evidence linked defendant with the murder. An "O ring" or gasket with an outside diameter of 2⅜ inches was found near the deceased's body. The "O ring" was similar to those sold by the National Seal Division of the Federal Mogul Corporation for use in "stack-o-drums," a 15-gallon container in which commercial acid is packaged, manufactured by the Union Carbide Company. While it could not be established with absolute certainty that the "O ring" in evidence was made by the Federal Mogul Corporation, since 11 other manufacturers, including three in the Los Angeles area, produced similar acid-resistant gaskets, the object in evidence was identical to those used by Union Carbide.

On November 2, 1966, the Los Angeles chemical plant of McKesson and Robbins, which distributes sulphuric acid in Union Carbide "stack-o-drums," sold two drums to one "John Marshall." Each drum weighed 220 pounds and contained 15 gallons of sulphuric acid. The shipping clerk recalled the sale at trial since it was an unusual purchase. He believed that defendant had made the purchase but he could

not unequivocally identify defendant in court. The name and
address which the purchaser had signed on the bill of sale,
however, were demonstrated to be fictitious, and the People's
expert testified that the handwriting on the bill of sale was
disguised and careful comparison with exemplars of defend-
ant's handwriting persuaded him that defendant had signed
the bill.

Other evidence further implicated defendant. His wife's
aunt, Mary Huntley, recalled that sometime in October or
November defendant had asked her permission to store a
package in her garage. She saw a can in the garage the follow-
ing day, but when asked if it was similar to People's Exhibit
No. 43, a "stack-o-drum," her memory was unclear: "Seems
like it. I don't know. Wasn't paying attention to that." At
trial Elijah Butler, an uncle of defendant's wife, denied that
he had seen a can similar to a "stack-o-drum" in his sister's
garage or backyard; he had previously told David Correa, an
investigator from the district attorney's office, however, that
he had seen a similar can. Defendant's mother-in-law could
not recall with any specificity defendant's visit to her home.

Defendant's wife, Mary Bradford, remembered with clarity
the important events. She testified that defendant had asked
her aunt for permission to use the garage at her mother's
house on November 3; at that time she, her mother and her
aunt, and one or two others were playing cards. She recalled
that defendant soon returned from her aunt's house, which
was nearby, and she watched while defendant discarded some-
thing into a trash barrel. Upon defendant's departure she
retrieved two tags from the barrel. One of the tags was
stamped "11-66," contained the legend "Sulphuric Acid, 66
degree BE chemical," and the name of McKesson and Rob-
bins. A second tag was a caution tag used on "stack-o-
drums." Later that afternoon she visited her aunt's home
where she saw two cans in the garage, one of which was simi-
lar to People's Exhibit No. 43. On November 5, two days
later, she again visited her aunt's home and this time
observed but one can. When she saw defendant on November 5
he gave her jewelry that had belonged to the victim, Betty
Peace. Finally, at trial Mrs. Bradford produced shoes, similar
in size and brand to those worn by defendant during his trial,
which had been, in a chemist's opinion, subject to the action
of sulphuric acid. She said defendant was wearing these shoes
on November 5 when he reappeared, his clothes in disarray, at
his mother-in-law's house.

Defendant had known Betty Peace, the victim, since 1963,

when she arrived in California from her home in North Carolina. In the summer of 1964, and again in 1965 and 1966, the couple, representing themselves as husband and wife, journeyed to North Carolina where they visited Betty's mother and aunt. In the summer of 1966 Betty's aunt, who had raised Betty as a young girl, noticed that she had suffered a small head laceration; defendant explained he had hit her with "that thing," indicating a pistol on the seat of the car. In the fall of 1966 Betty, who had been in North Carolina, rejoined defendant in Detroit, and they traveled by car as far as Phoenix, proceeding from there by plane to Los Angeles. In Amarillo, Texas, the two had called Betty's aunt, and defendant stated they were going to Los Angeles to pick up a 1967 Buick and would soon return to North Carolina to live. Again at 11 p.m. (Los Angeles time) on November 3 they called Betty's aunt, and defendant assured her they would be leaving the following day for North Carolina.

They had arrived in Los Angeles on November 1, and under the name of Mrs. Betty Bradford had rented a white Ford, license number RTR 730. They spent the nights of November 1 and 2 at the Continental Hotel where defendant registered them as "Mr. and Mrs. Wilmer Harris," using his cousin's name and a nonexistent address. On the registration card it was noted that their car bore the license RTR 730. On the morning of November 2 defendant made a hairdresser appointment for Betty; the beautician testified that Betty, whom she had known for several years, came into the shop alone at 1 p.m., and that defendant did not pick her up until early evening. Lastly, prosecution evidence showed that defendant's cousin Wilmer Harris, defendant's wife Mary Bradford, and defendant returned the rented car on November 5. It had been driven 328 miles.

Defendant testified in his own defense. He denied he had purchased two "stack-o-drums" of sulphuric acid from McKesson and Robbins; on behalf of the defense a handwriting expert testified that the signature and address on the bill of sale could not, in his professional opinion, be ascribed to defendant. Defendant denied he had asked his wife's aunt for permission to store a package; while he admitted that the shoes introduced in evidence belonged to him, he said he had left them with his wife. He explained that on November 2 he had taken Betty to the hairdresser while he visited a barber shop a few doors away. He and Betty spent the night of November 3 at the Flamingo Motel, and he saw Betty for the

last time around noon on November 4. He had told her that he and his wife, Mary, had to leave for Oakland to check on some property. According to defendant, Betty was upset by the prospect that he would soon see and go to Oakland with his wife and announced that if he did so, she would return to North Carolina. Defendant testified he gave her $200 for the trip and left for his mother-in-law's house where he spent the rest of November 4, including that night, and November 5. Defendant denied he gave his wife jewelry that belonged to Betty; the last time he saw the jewelry, he said, it was in Betty's possession.

It is undisputed that defendant and his wife went to Oakland on November 6 and returned to Los Angeles the next day. On November 8. accompanied by Gloria Dixon, an acquaintance who wanted to go east, defendant departed for Chicago by way of Phoenix where he picked up his car. He testified that before he left. he had tried to reach Betty at telephone numbers she had given Wilmer Harris while he was in Oakland. Mr. Harris had previously testified he received·calls from Betty on November 5, 6, and 7. Defendant testified he was unable to contact Betty upon his return from Oakland.

The defense also introduced the registration card at the Flamingo Motel where defendant testified he spent the night of November 3 with Betty. The card indicated that the parties had checked out on November 4; but the card was smudged, and the proprietress, on behalf of the People, testified that it had originally read November 8. She further said she could not recall having seen the victim between November 4 and 8, the date defendant left the Los Angeles area. The card had been retrieved by Mrs. Nettie Walker. a defense witness, and the jury could infer that it had been altered.

A principal objective of the defense was to discredit Mary Bradford's testimony. She had filed for divorce in 1964 because she knew defendant had been keeping company with other women; she had received a final decree at the time defendant was on trial. Defendant, a professional gambler who traveled extensively. said he regularly used his cousin's name at motels to avoid detection by his wife. who would otherwise harass him with phone calls. Mrs. Bradford testified she was jealous; she tried to save her marriage. but she realized her course was futile. She admitted she had once stabbed Betty in defendant's presence. For several months Mrs. Bradford did not produce the tags from the "stack-o-drums" or mention the shoes and jewelry to the district attorney's office. She testified, however, that she was afraid.

There was evidence that an investigator from the district attorney's office discussed the possibility of obtaining county aid for her and her child but Mrs. Bradford denied any promises had been made.

Finally, Mrs. Walker, who was with defendant when he called his wife from the east in December 1966, testified that Mrs. Bradford, upon informing her husband that Betty was dead, said, ''How long did you think I was going to go on like this? When are you going to send for me?'' The theory of the defense, in essence, was that defendant's wife and another unidentified person conspired to kill Betty Peace. In response to a question put by the defense attorney to Mrs. Bradford if she and another had participated in the murder, she replied, ''No, we did not. I did not.''

The foregoing evidence adduced at trial is set forth because defendant's first contention on appeal is that it was insufficient to support the judgment.  ▇ We reiterate here, however, what was recently said in *People* v. *Saterfield* (1967) 65 Cal.2d 752, 759 [56 Cal.Rptr. 338, 423 P.2d 266] : ''Defendant in effect requests us to reweigh and reinterpret the evidence in a manner consistent with innocence of the crime of first degree murder. But such a determination is the function of the trier of fact; at this stage the test is not whether the evidence may be reconciled with innocence, but whether there is substantial evidence in the record on appeal to warrant the inference of guilt drawn by the trier below. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382], and cases cited.) ''

▇ In this case the salesman at McKesson and Robbins qualifiedly identified defendant in court as the purchaser of two ''stack-o-drums'' of sulphuric acid. The People's handwriting expert said in his best judgment the handwriting on the bill of sale was defendant's. The testimony of Mrs. Bradford, if believed, resolved any doubt about defendant's culpability in the murder. At the same time the jury, as the final arbiter of controverted fact, was free to reject exonerating testimony, such as the opinion of defendant's handwriting expert, presented by the defense. We can only conclude that substantial evidence supports the judgment.

▇ Defendant next contends that the trial court erroneously allowed into evidence photographs, including three in color, of the body of the victim. We cannot agree. It has been repeatedly held to be within the trial court's discretion to determine whether the inflammatory effect such exhibits might

have upon the jury outweighs their probative value. (See, e.g., *People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65], and cases cited therein.) The color photographs depict the body in the area where it was discovered, and were thus relevant on the issues of cause and time of death. The other photographs, in black-and-white, show the state of the body in various positions at the time of the autopsy, and are similarly relevant. While the exhibits are not pleasant to view, we cannot say as a matter of law that their introduction into evidence constituted an abuse of discretion.

Defendant also contends that the trial court erroneously permitted Mary Bradford to testify over his objection on grounds of husband-wife privilege. He appears to confuse, however, two distinct kinds of interspousal privileges.

One privilege, which either spouse may exercise, protects ''confidential communications'' made during marriage by one spouse to the other; codified in former Code of Civil Procedure section 1881, subdivision 1, it was recodified without substantial change—insofar as here relevant—in Evidence Code section 980.[1] Defendant's claim of privilege on this ground lacks merit for the simple reason that the prosecution offered no evidence of any such communications. The deputy district attorney, Mr. Fukuto, assured the court that he did not intend to produce evidence of this nature, and the record shows that he scrupulously adhered to his promise.[2]

The second privilege apparently claimed by defendant is that relating to testimony given by one spouse against another. Under former Code of Civil Procedure section 1881,

---

[1]Section 980 provides that, subject to certain exceptions, ''a spouse (or his guardian or conservator when he has a guardian or conservator), whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife.''

[2]For example, when Mrs. Bradford testified on direct examination that she received a phone call from defendant on November 3, 1966, Mr. Fukuto warned her not to divulge the contents of the conversation; the mere fact that a communication took place, as distinguished from the substance thereof, is not protected by the privilege. (*Estate of Pusey* (1919) 180 Cal. 368, 373-374 [181 P. 648].) When the witness testified that defendant thereafter appeared at her mother's house, Mr. Fukuto established that there were other persons present before asking her what defendant said at that time; in such circumstances, of course, any communication would not have been ''confidential.'' Finally, the various *acts* of defendant witnessed and testified to by Mrs. Bradford, such as his placing the cans in the garage and giving her the victim's jewelry, are not ''communications'' within the meaning of the privilege. (*Tanzola* v. *De Rita* (1955) 45 Cal.2d 1, 8-9 [285 P.2d 897].)

subdivision 1, a wife could not, with certain exceptions, be called as a witness against her husband without his consent; Evidence Code section 970, however, narrows the scope of this privilege by placing its exercise solely within the election of the testifying spouse.[3]     Here Mrs. Bradford elected to testify against defendant, and her motives for doing so were fully explored. Defendant points out that although the Evidence Code was in force at the time of his trial, it had not yet taken effect when the crime was committed; from this chronology he argues that reliance on section 970 in the present case resulted in depriving him of a "vested property right" in the exercise of the former privilege and constituted the imposition of an ex post facto law.

As we noted above, however, Mary Bradford received a final decree of divorce from defendant during the course of the trial; more specifically, the prosecution established by her uncontradicted testimony that the decree was awarded some days *prior* to the time she took the stand. When she did so, therefore, she was no longer defendant's wife.     Both under the new statute and the old, the privilege relating to testimony by one spouse against another may be claimed only if there is a valid marriage in existence at the time the witness is called to the stand: thus Evidence Code section 970 (*ante,* fn. 3) grants the privilege to "a married person," and former Code of Civil Procedure section 1881, subdivision 1, characterized the parties protected by the privilege as "a husband" and "a wife."[4] It follows that a final decree of divorce dissolving the marriage of the parties ipso facto terminates the testimonial privilege. (See generally Witkin, Cal. Evidence (2d ed. 1966) pp. 775-776.)     Defendant's attempt to prevent his former wife from testifying against him thus came too late, and was properly rejected.[5]

---

[3]Evidence Code section 970 declares: "Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding." (See also Evid. Code, § 971 [spouse's privilege not to be called to witness stand].)

[4]The contrast with the privilege for confidential marital communications, discussed earlier, is both deliberate and striking. Evidence Code section 980 (*ante,* fn. 1) provides that such privilege may be exercised during the marital relationship "and afterwards," and refers to communications made while the parties "were" husband and wife. The Law Revision Commission comment to the section explains that "The privilege may be claimed as to confidential communications made during a marriage even though the marriage has been terminated at the time the privilege is claimed. This states existing law." (See former Code Civ. Proc., § 1881, subd. 1 ["during the marriage or afterward"].)

[5]Inasmuch as defendant has earnestly pressed his ex post facto argument upon us, we shall explain that it would not have prevailed in any

■ Defendant asserts that his Fourth Amendment rights were abridged because the complaint seeking the warrant for his arrest merely set forth the terms of the statute violated and failed to allege any underlying facts from which a magistrate could conclude there was probable cause to believe he had committed the alleged offense. Under compulsion of applicable federal law a majority of this court recently held that arrest warrants issued on "information and belief" do not comport with Fourth Amendment requirements unless facts are stated which support a complainant's belief that a defendant has committed a felony. (*People* v. *Sesslin* (1968) 68 Cal.2d 418, 423-425 [67 Cal.Rptr. 409, 439 P.2d 321].) Once an accusatory pleading has been filed, however, a defendant is no longer held on the arrest warrant, and thus he cannot complain solely on the basis of an alleged defect in the issuance of the warrant. ■ It is no defense to a state or federal criminal prosecution that a defendant was illegally arrested or forcibly brought within the jurisdiction of the court. (See, e.g., *Frisbie* v. *Collins* (1952) 342 U.S. 519 [96 L.Ed. 541, 72 S.Ct. 509].) If he can show that law enforcement officials exploited the period of illegal detention to

event. Article I, section 10, of the United States Constitution prohibits any state from passing an ex post facto law. In one of its earliest cases the Supreme Court included among statutes deemed ex post facto "Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender." (*Calder* v. *Bull* (1798) 3 Dall. 386, 390 [1 L.Ed. 648, 650].) But in subsequent decisions the Supreme Court has departed from the rigorous standard enunciated in *Calder*. Thus, in *Hopt* v. *Utah* (1884) 110 U.S. 574, 588-589 [28 L.Ed. 262, 268, 4 S.Ct. 202], the court rejected the argument that a law permitting felons to testify constituted as to Hopt an ex post facto law: "Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure of the proof which was made necessary to convictions when the crime was committed." In *Thompson* v. *Missouri* (1898) 171 U.S. 380, 386 [43 L.Ed. 204, 207, 18 S.Ct. 922], the court sustained the prosecution's use upon retrial of a newly enacted statute permitting the introduction into evidence of handwriting exemplars. In so holding, the court relied on its reasoning in *Hopt* with an admonition that "undue weight" should not be placed on "general expressions" in older opinions "that go beyond the questions necessary to be determined"—an oblique reference to the dictum in *Calder* v. *Bull* on which defendant relies. It is unmistakably clear, therefore, that changes in the rules of evidence which broaden the class of persons competent to testify are not deemed ex post facto in operation. (See also *Beazell* v. *Ohio* (1925) 269 U.S. 167, 171 [70 L.Ed. 216, 218, 46 S.Ct. 68].)

obtain evidence utilized at trial, of course, he is entitled to have the evidence suppressed. ■ (See, e.g., *People* v. *Sesslin, supra,* 68 Cal.2d 418, 426.) In the absence of such a showing, which defendant Bradford does not purport to make, a defendant cannot claim error on appeal.

■ Our independent review of the guilt phase reveals only one error to have occurred. At trial Elijah Butler could not recall having seen a "stack-o-drum" in his sister's garage; his testimony was impeached by David Correa, an investigator, who testified that in an earlier interview Mr. Butler stated he saw a "stack-o-drum" in his sister's backyard. The trial court initially instructed the jury that the investigator's testimony could be considered for impeachment purposes alone; but the following morning the court, on its own motion and over objection of both counsel, reinstructed the jury that it could consider the investigator's testimony as substantive evidence tending to show that Mr. Butler had in fact seen a "stack-o-drum." ■ Under section 1235 of the new Evidence Code the court's reinstruction appeared warranted, but we have since determined that section 1235 may not constitutionally be applied in criminal cases because it violates the defendant's Sixth Amendment right to confrontation. (*People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111].)

In *Johnson* (*id.* at pp. 660-661) we made clear that such error is of federal constitutional dimensions, and the governing test of prejudice is therefore that set forth in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. ■ It will be recalled that defendant's wife testified she saw a "stack-o-drum" in her aunt's garage, and Mrs. Huntley, the aunt, dimly remembered that she might have seen something similar to a "stack-o-drum." Of more importance, Mrs. Bradford had in her possession tags from "stack-o-drums" sold by McKesson and Robbins, and from the outset the jury could only believe that either defendant or his wife had secured the acid. The storage of the acid in Mrs. Huntley's garage is strictly neutral in the sense that it is consistent with both the defense and prosecution theory of the events that led to the murder. On review of the record we can thus unequivocally state that we "believe that [the error] was harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at p. 711].)

■ Under compulsion of *Witherspoon* v. *Illinois* (1968)

*supra,* 391 U.S. 510, we have concluded that defendant must be accorded a new penalty trial.

Of the 48 veniremen called, 10 were excused for cause by reason of their attitude toward capital punishment. Of these ten, seven stated unequivocally that their views precluded them from returning a capital verdict in any case, and they were thus properly excused. (*Id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) At least one of the remaining three, however, was stricken from the jury in violation of the mandate of *Witherspoon.*

The trial court asked the venireman in question, "Now, do you have any conscientious scruples that would preclude you from voting for the death penalty in a proper case?" The venireman responded, "Yes, I do." The court continued: "You understand I am not telling you what a proper case is. That is something you have got to decide for yourself, and you are telling me you can't conceive of any case that you would be able to vote for the death penalty, is that correct?" The venireman answered, "Without being very nervous, no, sir." The court then asked: "In other words you feel nervous and the physical effect upon you might be too great?" The venireman said, "Yes," and she was then excused for cause.

The venireman did not make it "unmistakably clear" that she would "automatically" vote against infliction of the death penalty, as *Witherspoon* requires. (*Id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) Nor was there an adequate showing of cause to excuse her. ▮▮▮ An occasional venireman, though not averse to voting in favor of death, may anticipate such a physical or emotional reaction from his participation in a capital vote that his service on the jury should not be compelled. Before a challenge for cause can be sustained, however, the venireman must explain in his own words why he would expect such a reaction. If he sets forth reasons based on his background and medical history, and these reasons are deemed persuasive, the court can dismiss him for cause pursuant to the statutory provision allowing such dismissal for "Unsoundness of mind, or such defect in the faculties of the mind or organs of the body as renders him incapable of performing the duties of a juror." (Pen. Code, § 1072, subd. 3.) Unless the record plainly shows the venireman was found to be thus incapacitated, however, we cannot assume on appeal that he was disqualified on that ground.

▮▮▮ The venireman herein expressed little more than a deep uneasiness about participating in a death verdict. She complained that a death vote would make her "very nerv-

ous'' and agreed with the trial court's suggestion that such a vote might have a ''great physical effect'' on her. It cannot be said from this limited examination that the venireman was physically ''incapable of performing the duties of a juror.'' The decision that a man should die is difficult and painful, and veniremen cannot be excluded simply because they express a strong distaste at the prospect of imposing that penalty. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 515, fns. 8, 9 [20 L.Ed.2d at p. 781].)

The judgment is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I would affirm the judgment in its entirety.

Appellant's petition for a rehearing was denied March 12, 1969, and the opinion was modified to read as printed above. McComb, J., was of the opinion that the petition should be granted.