[Crim. No. 23769. Second Dist., Div. One. July 5, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY FRANCIS LEARY, Defendant and Appellant.

528

## Counsel

Belli, Ashe, Ellison & Choulos, Belli, Ashe & Choulos, Melvin M. Belli, Vasilios B. Choulos and Kent A. Russell for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and Kent L. Richland, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

WOOD, P. J.—In an indictment defendant Leary was accused of violating section 4530, subdivision (b), of the Penal Code in that on September 12, 1970, he unlawfully escaped from a state prison (California Men's Colony) in the County of San Luis Obispo. Prior to entering his plea, he made a motion "to dismiss and set aside custody," on the ground that the trial court did not have jurisdiction to try him. The motion was denied. In a jury trial he was found guilty. Upon his appeal from the judgment, he contends that the trial court did not have jurisdiction to try him, because he was abducted in Afghanistan, by agents of the United States acting under color of state authority, and was transported through other foreign coun-

tries and returned to California, in violation of international law, treaties, and the Fourth Amendment of the Constitution of the United States.

Defendant had been in the state prison by reason of his having been convicted on March 16, 1970, in the Superior Court of Orange County, of violating section 11530 of the Health and Safety Code (possession of marijuana). He was sentenced, upon such conviction, to state prison for the term prescribed by law (6 months to 10 years) and he was remanded to the sheriff of that county for delivery to the Director of Corrections. He was delivered into custody of the Department of Corrections, and was confined to penal institutions at Chino and Vacaville.

On May 13, 1970, he was transferred to California Men's Colony, West Facility, in San Luis Obispo County, and was confined there until September 12, 1970. In that prison he was assigned to "Dorm 325, bed 7." About 8:15 p.m. on September 12, Officer Butterfield saw the defendant sitting on his bed (7) in the dormitory; and about 9:30 p.m. he saw the defendant in a corridor of the dormitory—when defendant was passing him. At that time, defendant was wearing blue denim pants, a blue sweater, and white tennis shoes. Other clothing "available to him" was a blue denim jacket. About 11:40 p.m. while the officer was making "the 11:40 count," he noticed that "325, bed 7" was empty, and then he made "a check of the immediate area" to locate the defendant, and he searched the buildings and gardens, but could not find the defendant.

Then the officer returned to defendant's room, opened his locker, and found therein a yellow paper upon which there was typewriting, as follows:

"In the name of the Father and of the Son and of the Holy Ghost, Ave Maria. Prison guards, listen. To cage living creatures is a sin against God, a crime against nature. Listen prison guards. You stand convicted in the court of history as criminals and as sinners.

"In the uniform of Athens you jailed Socrates.

"In the uniform of Rome you arrested Jesus Christ.

"In the uniform of Germany you caged 6,000,000 Jews.

"In the livery of Nixon and Reagan you have turned this land into a police state.

"Listen, guards, to the ancient truth. He who enslaves is himself enslaved. The future belongs to the blacks and the browns and the young and the wild and the free.

"Oh, prison guards, I pray that you will repent and reform. Open the gates of your hearts and be free. Break out. Follow me to freedom and love and laughter. Be free, prison guards, be free."

Under the mattress on defendant's bed, the officer found a towel that was stained by blue ink. About 5 a.m. on September 13, an employee of a gasoline station on highway 101 in San Luis Obispo found a blue denim jacket and blue denim pants in a trash can in the restroom of the station. He telephoned the California Men's Colony; and an officer came to the station and picked up the pants and jacket, which bore defendant's prison number. That officer also found blue ink on a cable that extended from inside the prison over a fence to a telephone pole outside the fence; and he found blue ink on the stepping spikes on the telephone pole.

About 16 months thereafter (Jan. 16, 1972) the Consul of the American Embassy in Kabul, Afghanistan, gave defendant's passport to Officer Burke, a special agent of the Federal Bureau of Investigation. The agent, who did not know that defendant was under arrest, entered an airplane at the Kabul airport on January 17, 1972. Thereafter on that day, the defendant and a woman (Joanna Harcourt-Smith) entered the airplane. The agent introduced himself to them, and they asked where the airplane was going. He replied that it was going to Paris. They asked for tickets, and he gave tickets to them. When the airplane was in flight, he told them that he had been advised by the Consul that "the passport had been seized due to prior revocation by the State Department." The agent gave defendant a State Department identity card which had been issued in lieu of a passport, and he told defendant that it was good for direct return to the United States. The agent did not arrest defendant, or place him in custody, or question him regarding the escape; nor did the agent make any arrangement for defendant to be on the flight.

The airplane went from Kabul to Tehran, Istanbul, Paris, Frankfurt, and London. The agent did not restrict the defendant or the woman from leaving the airplane at those places. At Frankfurt the woman expressed a desire to leave the airplane, and she could have left the airport terminal because she had a passport, but the defendant could not leave the terminal because he would have to pass through the "German passport control." Agent Burke did not prevent defendant from attempting to pass through the German passport control.

When the airplane landed in London, British immigration authorities asked defendant to accompany them to an office in order to determine

whether defendant wanted to request political asylum. Agent Burke did not restrain defendant from accompanying them. Defendant told them that he requested political asylum on "the basis of persecution that he had sustained in the United States." The immigration officials said that they would take the request under consideration and refer it to a higher authority. Defendant had further discussion with the officials, and one of them told him that his request had been turned down. Then defendant asked that he be sent to Algeria, Switzerland, or Austria. In response to that request, one of the British officials said that the British authorities understood that defendant had been ejected from those countries and therefore they did not have the right to send him to any of those places. Agent Burke did not prevent defendant from requesting asylum or from requesting that he be sent to any of those countries.

During the flight from London to Los Angeles the defendant conversed with Agent Burke, but the agent did not initiate any of the conversations, and did not question defendant about the charge of escape. In a conversation with the agent in the lounge of the airplane, when other persons were in the lounge, the defendant asked the agent whether he knew of "the situation surrounding his escape and how he had escaped." The officer replied in the negative, and the defendant said that he "had gone over the wire" and that later he had been picked up by his daughter and his son-in-law and was "driven to a gasoline station where he was picked up by the Weathermen organization who then took him the rest of his journey."

Appellant refers, in his brief, to testimony of Joanna Harcourt-Smith regarding the flight from Kabul to Los Angeles. That testimony was offered only on the question of "suppression of evidence" of defendant's confession (of escape) made to the agent in the lounge of the airplane.[1] She testified, out of presence of jury, that when she and the defendant entered the airplane at Kabul, Burke identified himself as a police officer and showed defendant's passport to the defendant; the word "cancelled" was

---

[1]Defendant's motion "to dismiss and set aside custody" for asserted lack of jurisdiction of his person was made before he entered his plea. The record does not show what evidence, if any, was presented at the hearing of that motion. In his brief, defendant-appellant uses the testimony of Harcourt-Smith (which was offered only on the motion to suppress evidence) as an evidentiary basis for his contention that the court lacked jurisdiction. When she (Smith) was called as a witness by the defendant, defendant's attorney said that her testimony was offered only on the question of suppression of evidence. Then defendant himself asked her questions and said that he was attempting to elicit in his line of questions whether his passport was illegally seized. The judge said that the line of questioning was not pertinent to the examination of her in that she was being examined only on the issue of admissibility of defendant's alleged confession; and that the question as to how the defendant got back to this country was not relevant to the issue of admissibility of the alleged confession.

on the passport; Burke told them to sit on the front seats; he did not sit with them; he engaged them in conversation several times during the flight, and defendant asked him to leave them alone; on the flight to Frankfurt she passed a note to other passengers, which note stated that Timothy Leary was being kidnaped and that he asked for assistance; when they arrived at Frankfurt, the defendant demanded that they be sent to a hotel; the demand was refused; Burke told them that the German police would not let them enter Germany; Burke and German officials escorted them to another section of the airport; defendant asked to see a doctor; when they arrived at the airport in London, several officers were waiting for them; defendant was attempting to get a lawyer during the time they were in London; defendant asked the officers for political asylum and religious asylum; and during the flight from Kabul to London the defendant "seemed like he didn't really care or realize what was happening."

Defendant's testimony (out of presence of jury, on issue of admissibility of his alleged confession) was in part similar to the testimony of Smith on that issue. He testified further that he had a valid passport in Kabul and that it was confiscated while he was in a line at the American Embassy in Kabul a few days prior to the day when he boarded the airplane; after his passport was confiscated, he was taken to "Central Police Headquarters"; he did not attempt to contact the American Embassy; the Kabul police held him in custody and took him to a "police hotel"; the cousin of the King of Afghanistan came to see him and told him that it was a national holiday, that the King and the officials were out of Kabul, and that he (cousin) would get a lawyer and see that Leary "had a hearing"; on the morning the airplane left Kabul, officials of Afghanistan told him he was to leave Afghanistan; he told them he would not leave without a hearing and until he got his passport back; they said that the Americans had his passport; and he was taken to the airplane.

The court ruled that evidence as to the alleged confession was admissible.

On the issue of guilt as to escape from prison, the defendant testified, and called as witnesses persons who were neurologists, psychiatrists, and alleged experts in the field of psychology, sociology, religion, and philosophy. Appellant states in his brief that his "case (in the trial court) consisted of such testimony in support of his "defense of 'unconsciousness' " based upon "involuntary intoxication—diminished capacity" by reason of his experimentation with drugs that had "mind-altering" or "psychotropic" effects. On appeal, the appellant has not made a contention regarding unconsciousness or sufficiency of the evidence to support the verdict.

Appellant contends, as above stated, that the trial court did not have jurisdiction to try him because he was abducted in Afghanistan by agents of the United States acting under color of state authority, and was transported through other foreign countries and returned to California in violation of international law, treaties, and the Fourth Amendment of the United States Constitution. He states that he agrees that there are many cases holding that persons abducted in violation of law may not allege that fact by way of a plea to the jurisdiction. He states, however, that the instant case involves an unpopular defendant who is "constrained to resist the kind of inertia that might stifle Appellant's claim in a mass of citations to cases totally distinguishable in law, in fact, and upon their underlying policies."

*Ker* v. *Illinois* (1886) 119 U.S. 436 [30 L.Ed. 421, 7 S.Ct. 225], is a case wherein it was held that forcible abduction of a person in a foreign country was not a sufficient reason that the person should not answer, when brought within the jurisdiction of the court which has the right to try him for an offense committed within the jurisdiction of the court; and that the abduction presented no valid objection to his trial in such court.

Appellant Leary asserts that the *Ker* case is "grounded upon the state of constitutional law as it existed in 1886" and that the advanced state in our country's legal and historical development "requires a brand new look at" the *Ker* case.

In the *Ker* case, the Governor of Illinois had sent a requisition to the Secretary of State of the United States for a warrant requesting extradition of the defendant Ker by the Republic of Peru from Peru to Cook County, Illinois. The President of the United States issued a warrant, directed to one Julian, as messenger, to receive defendant from the authorities of Peru, upon a charge of larceny, in compliance with a treaty. Julian went to Peru, but, without presenting the extradition papers to any officer there, or making any demand on the government for the surrender of Ker, forcibly arrested him, placed him on a ship, kept him a close prisoner until arrival of the ship at Honolulu, where he was transferred to another ship and taken to San Francisco. Then, pursuant to other extradition proceedings initiated by the Governor of Illinois, defendant was taken to Cook County, Illinois, where he was indicted, tried, and convicted of larceny. A contention on appeal in Illinois was that the trial court (in Cook County) erred in sustaining the People's demurrer to his plea to the jurisdiction of the court. The Illinois Supreme Court affirmed the judgment of conviction. The United States Supreme Court said (p. 444 [30 L.Ed. p. 424]): "The question of how far his forcible seizure in another country, and transfer by violence,

force, or fraud, to this country, could be made available to resist trial in the State court, for the offense now charged upon him, is one which we do not feel called upon to decide, for in that transaction we do not see that the Constitution, or laws, or treaties, of the United States guarantee him any protection. There are authorities of the highest respectability which hold that such forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offence, and presents no valid objection to his trial in such court."

Recent cases have reaffirmed the rule in the *Ker* case.

In *Frisbie* v. *Collins* (1952) 342 U.S. 519, 522 [96 L.Ed. 541, 545-546, 72 S.Ct. 509], it was said: "This Court has never departed from the rule announced in *Ker* v. *Illinois,* 119 U.S. 436, 444, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with con-stitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."

In *People* v. *Bradford* (1969) 70 Cal.2d 333, 344 [74 Cal.Rptr. 726, 450 P.2d 46], it was said: "It is no defense to a state or federal criminal prosecution that a defendant was illegally arrested or forcibly brought within the jurisdiction of the court. (See, e.g., *Frisbie* v. *Collins* (1952) 342 U.S. 519 [96 L.Ed. 541, 72 S.Ct. 509].)"

In *People* v. *Garner* (1961) 57 Cal.2d 135, 141 [18 Cal.Rptr. 40, 367 P.2d 680], appellant contended that the trial court was without power to try him because of the method used by arresting officers in bringing him to California (from Mexico). The court held (p. 141): "This contention is devoid of merit. It is immaterial whether there was a compliance with the Mexican extradition laws or Arizona laws on arrest and extradition. Cali-fornia follows the federal rule relative to the trial of a defendant who has been obtained from outside the jurisdiction of this state. The rule is that it is immaterial whether a defendant has been forcibly seized in another country or state and transferred to this state by violence, force, or fraud for trial for an offense alleged to have been committed in this state, there being no provision in the Constitution, laws or treaties of the United States

which guarantees him any protection in such transaction." (Citing *Ker* v. *Illinois, supra,* and *Frisbie* v. *Collins, supra.*) In the *Garner* case, the court set forth the above quotation from the *Frisbie* case to the effect that the United States Supreme Court has never departed from the rule announced in *Ker* v. *Illinois,* and that there is nothing in the Constitution that requires a court to permit a convicted person to escape justice because he was brought to trial against his will.[2]

As to asserted rights under international law, it has been held (*United States* v. *Sobell,* 142 F.Supp. 515, 523, affd. 244 F.2d 520, cert. den., 355 U.S. 873 [2 L.Ed.2d 77, 78 S.Ct. 120, 121]) that "seizure of a fugitive on foreign soil in violation of international law will not deprive the courts of the offending state of jurisdiction over the person of the fugitive when he is brought before them."

As to appellant's asserted rights under the Fourth, Fifth, and Fifteenth Amendments, he argues, in substance, that the actions whereby he was abducted constituted illegal search and seizure; the abduction was "state action" which denied him due process of law; the revocation of his passport was an infringement upon his personal liberty; and he was denied his "fundamental right" under the Constitution to seek asylum in a foreign country.[3] Under the above authorities, the trial court had jurisdiction to try the defendant on the charge of escape. There was ample evidence to support the verdict.

The judgment is affirmed.

Lillie, J., and Hanson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 28, 1974.

---

[2]Other recent cases in which the rule in the *Ker* case has been followed are: *United States* v. *Cotten* (9th Cir. 1973) 471 F.2d 744, 748; *United States* v. *Caramian* (5th Cir. 1972) 468 F.2d 1370, 1371; *State* v. *Stone* (Me. 1972) [294 A.2d 683, 693-696]; *Huffman* v. *State* (Mo. 1972) 487 S.W.2d 549, 553.

[3]It is not clear whether appellant's claimed denial of constitutional rights refers to his alleged confession, which he made during the flight from London to Los Angeles. In *People* v. *Bradford, supra* (70 Cal.2d at p. 344), it was said that it is no defense to a state or federal criminal prosecution that a defendant was illegally arrested or forcibly brought within the jurisdiction of the court (citing *Frisbie* v. *Collins, supra*). It was also paid (pp. 344-345): "If he can show that law enforcement officials exploited the period of illegal detention to obtain evidence utilized at trial, of course, he is entitled to have the evidence suppressed." In the present case the court heard evidence upon the motion to suppress evidence of the asserted confession, and denied the motion. In reviewing that determination, all factual conflicts must be resolved in the manner most favorable to the trial court's disposition of the motion (*People* v. *Martin,* 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161]), and the function of this court is to determine whether there was substantial evidence to support the trial court's findings. (*People* v. *Waters,* 30 Cal.App.3d 354, 359 [106 Cal.Rptr. 293].) In the present case the trial court did not err in denying the motion to suppress evidence of the confession.