[Crim. No. 8484. First Dist., Div. One. Nov. 12, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JEROME D. MILLER, Defendant and Appellant.

## Summary

924

## COUNSEL

W. Keith Woodmansee, under appointment of the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Derald E. Granberg and Karl S. Mayer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ELKINGTON, J.**—Defendant Jerome D. Miller, following a trial by jury, was convicted of two counts of rape by force and violence and threats of bodily harm (Pen. Code, §§ 261, subd. 4, 261, subd. 5), two counts of robbery (Pen. Code, § 211), and two counts of "simple kidnaping" (Pen. Code, § 207). The kidnaping convictions were of lesser offenses included within the information's charges of kidnaping for robbery (Pen. Code, § 209). He was sentenced to state prison on a robbery count and an unrelated kidnaping count, the sentences to run consecutively. Sentences on the remaining counts were stayed, such stays to become permanent upon completion of the consecutive sentences. His appeal is from the judgment.

There was substantial and convincing evidence in support of the jury's verdicts. But for Miller's insistence that the rule of *People* v. *Daniels,* 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225], discussed *post,* is applicable to the kidnaping convictions, no contention is made to the contrary.

Miller's principal contention of error is that he was unconstitutionally denied counsel by the superior court. As pertinent to this contention the record discloses the following: Miller's preliminary examination was held June 9, 1969.[1] He was represented by an assistant public defender. Early in the hearing his conduct became disruptive. He called the first complaining witness a liar and upon being admonished to keep quiet by the judge, replied, "Oh, shit." A moment later the following colloquy ensued:

"THE DEFENDANT: If I don't have any lawyer, I don't have to come and go through this preliminary.

"THE COURT: Mr. Miller—

"THE DEFENDANT: I don't have any probable cause to sit here and listen.

"THE COURT: You have counsel. Would you sit down.

"THE DEFENDANT: I don't have any counsel. I feel the public defender is working with the district attorney toward a—trying to construct a conspiracy. I'm going to file a—I'm going to take this to Federal Court too.

"THE COURT: Mr. Miller, you have had an opportunity to hire private counsel, and apparently you are unable to hire private counsel.

"THE DEFENDANT: Well, I can hire my own counsel. I will come back and hire my own counsel. I could have appointed somebody with some type of training.

---

[1]On motion of Miller the record on his appeal was augmented to include the transcript of his preliminary examination.

"THE COURT: You have counsel, Mr. Miller, and if you please keep still. If you don't I am going to have to have you gagged. Do you have sufficient money to hire private counsel.

"THE DEFENDANT: Yes, I can get sufficient money to hire a lawyer.

"THE COURT: Have you made any efforts?

"THE DEFENDANT: My people is supposed to be doing this now.

"THE COURT: Have you made any efforts to hire private counsel?

"THE DEFENDANT: Yes, I did.

"THE COURT: Have you talked to private counsel?

"THE DEFENDANT: I haven't talked with one yet, but one is supposed to come up and see me either today or some time this week."

The preliminary examination continued with the public defender in the case despite Miller's insistence "He's not representing me." Our examination of the transcript of that hearing discloses a competent performance by the public defender.

During or after the preliminary hearing Miller decided that the charges against him were "really too heavy of a beef for a public defender to even try to get into." He insisted that the public defender's office was incompetent and that "way back in Berkeley [where the preliminary examination was held] I had to release them from representing me in any way, shape, form or fashion."

A letter of the public defender to the court dated July 3, 1969, which was uncontradicted in any way by Miller, was read into the record. It stated: "Mr. Miller is charged with two counts of 209, two counts of 211 and two counts of 261. His jury trial is scheduled for August 6, 1969. He has stated in court that he does not want to be represented by the public defender and has told me in private. Previously, he had outlined assertive defenses to the charges and has emphatically stated his innocence and refusal to change his plea to any count. On July 2, I attempted to talk with him about the charges in an effort to prepare his defense. He refused to tell me anything about the charges other than the fact that he was not guilty and that he does not want me or any other public defender to represent him. He would rather represent himself. I attempted to reason with him, explaining the seriousness of the charges and my desire to assist him. I also tried to persuade him to tell me why he does not want the public defender. He would not tell me why and our conversation ended with his asking me to prepare a form for him to sign firing us. Since he refuses to cooperate with us in the preparation of his

defense, I respectfully request the court to relieve the public defender as his attorney pursuant to his wishes. . . ."

On July 11, 1969, the following proceedings were taken in the superior court.

"THE COURT: People versus Jerome D. Miller.

"[PUBLIC DEFENDER]: That matter is ready. Your Honor, in this matter I believe the Court is in receipt of a letter from Mr. Ryder.

"THE COURT: Yes, I am.

"[PUBLIC DEFENDER]: And it's my understanding Mr. Ryder attempted to communicate with Mr. Miller concerning his case and the defendant, Mr. Miller, refused to do so. We therefore move to withdraw from Mr. Miller's case for lack of cooperation that makes it impossible for us to adequately prepare his defense. I'm prepared to hand Mr. Miller—

"THE COURT: Well, wait a minute. Mr. Miller, Mr. Ryder, who has been assigned to your case out of the Public Defender's Office, states in his letter to me that on the 2nd of July he attempted to talk to you about the charges and that you told him nothing, except that you were not guilty. But you wouldn't go into any of the background or material that he needs to adequately represent you in the case. I'm wondering, do you understand that anything you say to him is what we call privileged? He cannot disclose it without your consent.

"THE DEFENDANT: Well, Your Honor, I don't want—

"THE COURT: Now, wait a minute. I just asked you a question. Do you want me to repeat the question?

"THE DEFENDANT: Yeah.

"THE COURT: Do you understand that anything that you say to your attorney cannot be disclosed or divulged by him?

"THE DEFENDANT: Yeah. But he's not my attorney. I don't want to be represented by him because my wife is hiring counsel for me to have when I do come to court. And I told him that he don't have no knowledge of my case. I never seen him.

"THE COURT: You don't want the Public Defender?

"THE DEFENDANT: No.

"THE COURT: All right. Do you have another attorney that you're going to hire?

"THE DEFENDANT: Yes, I do have an attorney.

"THE COURT: Who is that?

"THE DEFENDANT: Well, I haven't talked to my wife yet. I was supposed to have a visit today and she was supposed to let me know.

"THE COURT: You understand if I relieve the Public Defender at your request and you do not get a private attorney then you will be going into court without any attorney; do you understand that?

"[DISTRICT ATTORNEY]: This is a 209 charge.

"THE COURT: Do you understand that?

"THE DEFENDANT: Yeah, I understand that.

"THE COURT: And do you understand that you're charged with a very serious crime; that upon your conviction you could very well go to the state prison for a long period of time, maybe for the rest of your natural life; do you understand that?

"THE DEFENDANT: Yes, that's clear.

"THE COURT: And I think that before you get another attorney you'd better not discharge the Public Defender.

"THE DEFENDANT: This is one reason why I don't wish to be represented by a Public Defender, because if I'm going to get this much time I would like to be represented by the full force, Your Honor, and with the type of knowledge that bears on the case, not just sitting in my cell and not seeing a Public Defender until I come to Court.

"THE COURT: Now, listen to me. The Public Defender's office is one of the finest offices I know. And their lawyers are fine and competent, and Mr. Ryder, not the least of which he should be included. I think you'd better think this over.

"THE DEFENDANT: No, I don't have to think it over. I already made up my mind two months ago.

"THE COURT: Well now, I'm going to repeat again: If you discharge—

"THE DEFENDANT: I understand that.

"THE COURT: All right now—

"THE DEFENDANT: I understand that. That's clear.

"THE COURT: Stop talking.

"THE DEFENDANT: This has been explained to me before.

"THE COURT: Stop talking and listen. Then if your wife, or whoever, cannot get you private counsel, then you're not going to have any counsel. You're going to represent yourself; do you understand that?

"THE DEFENDANT: I hear what you're saying.

"THE COURT: Do you understand it?

"THE DEFENDANT: Yeah.

"THE COURT: All right. Now, do you still want to discharge the Public Defender?

"THE DEFENDANT: Definitely. Definitely, Definitely. I definitely don't want no Public Defender.

"THE COURT: All right. The Public Defender is relieved. . . . August the 6th for jury trial."

The trial started on August 7, 1969. Miller announced: "I don't wish to waive the [trial] date, Your Honor. Seriously I don't wish to waive any time. I want to go along with the trial and everything because I don't wish to waive one day."[2] He again asked the court for a "court appointed attorney" other than the public defender; the request was denied. He asked to be released on his own recognizance so that he and his wife could "try to work something out for us to hire sufficient counsel." He said his wife, from whom he had not heard for about two weeks, was making "an effort to hire me or obtain sufficient counsel." He apparently wanted a continuance for this purpose, but nevertheless insisted "I wouldn't want you to put my case off like that or go out of your way to do anything, because like I say I don't wish to waive the date. I would want a speedy trial." Then, ignoring the fact that he and the court had long ago discharged the public defender from the case, he complained, "The Public Defender I talked to hasn't come up to see me, he hasn't prepared my case. How can I go to trial if my case hasn't been prepared?" The court finally announced, "If you refuse to have the Public Defender, then unless you have counsel of your own for which you can pay, the Court has no alternative but to proceed with the trial without counsel."

The court then proceeded with the selection of a jury, in which Miller did not participate except to frequently observe that he had no attorney and that he was not representing himself. Toward the end of the jury selection process Miller asked, "Your Honor, do I have a right to waive time? Can I waive time until she can hire me sufficient counsel? All I need is a

[2]Penal Code section 1382, subdivision 2, provides for dismissal of a criminal action not brought to trial in the superior court within 60 days after filing of the information, unless the benefit of the section is waived.

week or two." The court declined to interrupt the trial, stating: "[T]he Court's business has to move forward. We have a jammed trial calendar and it would slow down the whole procedure if these Courts were put in the position of having to postpone a case on the odd chance that the defendant may get an attorney, when it is conceded in the first place that there aren't sufficient funds for that purpose. . . . Well, from what you have stated here this afternoon, it seems clear to me that you haven't the slightest idea when you would be able to get ready for trial." The trial proceeded to the jury's verdicts.

Specifically, Miller now contends that the trial court committed error of constitutional dimensions in granting the motion to dismiss the public defender.

■ It is now settled law that California's constitutional obligation to furnish counsel to an indigent defendant is discharged by the assignment of a public defender, " ' "except in a situation where the record clearly shows [that he] is not adequately representing the accused. . . ." ' " (*People* v. *Williams,* 2 Cal.3d 894, 904 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Marsden,* 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44].) Here there is a complete absence of any showing of inadequate representation; at most we have Miller's conclusion that his case was "really too heavy of a beef" for any public defender. The trial court properly declined to furnish another "court appointed attorney" at Miller's request.

■ It is equally well settled that a criminal defendant may waive his right to counsel if he has "an intelligent conception of the consequences of his act . . . and understands the nature of the offense, the available pleas and defenses, and the possible punishments." (*People* v. *Floyd,* 1 Cal.3d 694, 703 [83 Cal.Rptr. 608, 464 P.2d 64]; see also *People* v. *Carter,* 66 Cal.2d 666, 670 [58 Cal.Rptr. 614, 427 P.2d 214]; *In re Johnson,* 62 Cal.2d 325, 335 [42 Cal.Rptr. 228, 398 P.2d 420].) On appeal the defendant has the burden of establishing that he did not competently and intelligently waive that right. (*Moore* v. *Michigan,* 355 U.S. 155, 161-162 [2 L.Ed.2d 167, 172-173, 78 S.Ct. 191]; *People* v. *Kranhouse,* 265 Cal. App.2d 440, 447 [71 Cal.Rptr. 223].) ■ And where a defendant is able to competently and intelligently waive his right to counsel the court cannot force him to be represented by an attorney. (*Adams* v. *United States ex rel. McCann,* 317 U.S. 269, 279 [87 L.Ed. 268, 274, 63 S.Ct. 236, 143 A.L.R. 435]; *People* v. *Crovedi,* 65 Cal.2d 199, 208 [53 Cal.Rptr. 284, 417 P.2d 868].)

■ Our immediate inquiry then is whether Miller competently and intelligently waived his right to representation by the public defender.

It would have been preferred practice for the trial court to make formal inquiry into Miller's conception of the "consequences of his act . . . the nature of the offense, the available pleas and defenses, and the possible punishments." Indeed, under some circumstances failure to do so would constitute fatal error. But here the record abundantly supports the court's conclusion of an informed and competent waiver.

Miller was 22 years of age. He obviously possessed a high level of intelligence, and understood court and criminal procedure. He moved to be released on his "own recognizance"; failing in that he moved to reduce the amount set for his bail. Thereafter he took proceedings to dismiss the information under "Penal Code section 995." Apparently without assistance he sought release on habeas corpus alleging "That the Court and District Attorney violated Section 1382 of the California Penal Code" since he, the "Defendant has been held over 27 days in the Municipal Court. Defendant has not waived any time or rights." And the day before his trial started he moved to suppress certain evidence under Penal Code section 1538.5. He indicated complete awareness of the seriousness of the charges and possible penalties. Commenting on the preliminary examination he related that "then I found out what type of charges I had been charged with." He had been informed of the seriousness of the six charges of the information. When told before the release of the public defender that "upon your conviction you could very well go to the state prison for a long period of time, maybe for the rest of your natural life; do you understand that?" he responded, "Yeah, I understand that." Referring to his plight he called it a "heavy beef" and "serious beef" and said it "pertains to my life."

The constitutional standards for a competent and intelligent waiver of counsel, as announced by *People* v. *Floyd, supra,* 1 Cal.3d 694, 703, were met. No constitutional right was ever intended, or can reasonably be construed, to deny the constitutional duty of courts to function, and to try persons charged with crime. (Cf. *Illinois* v. *Allen,* 397 U.S. 337 [25 L.Ed.2d 353, 90 S.Ct. 1057].) There was no abuse of discretion, or other error, in accepting Miller's waiver of counsel and in dismissing the public defender.

Although, without counsel, Miller chose not to participate in his trial, the trial appears to have been fairly conducted, and, except for the contentions of this appeal, no argument is made to the contrary. The district attorney was restrained and fair. Full and timely discovery of the prosecution's evidence was afforded Miller, and at his suggestion that his mother and wife (to whom he was married after occurrence of the charged offenses) should be witnesses, the attendance of those persons was secured. And as we have indicated the evidence of Miller's guilt was convincing.

■ We see no merit in Miller's contention that his initial identification by photographs was constitutionally objectionable. After his arrest, each of the two complaining witnesses, on separate occasions and out of the presence of the other, was shown five photographs of Negroes. One was of Miller while the others were of persons of his general age and appearance. Each of the victims readily pointed to Miller as one of her assaulters. We see no unfairness or "impermissible suggestiveness" (see *Simmons* v. *United States,* 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967]) in these identifications, nor does Miller now point to any, except to say that only "five photographs were shown."

Furthermore, we find "clear, explicit, and unequivocal evidence" in the record, as required by *People* v. *Caruso,* 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336], of an independent basis for Miller's in-court identification. Each of the victims had an extended opportunity to observe the appearance and features of her attackers at the time of the crimes. Each testified that her in-court identification was based on such observations and not on her examination of the photographs. And each was positive in her identification.

■ Miller finally contends that since the evidence disclosed that he "transported the victims only as an incident to the commission of the" robbery and rape of his victims, his two kidnaping convictions must be reversed. He relies on *People* v. *Daniels, supra,* 71 Cal.2d 1119, and *People* v. *Williams, supra,* 2 Cal.3d 894, which decisions he contends compel such a result.

The facts upon which this contention is based follow. On each of two occasions Miller and another stopped their automobile and offered a young girl waiting on a busy street corner a ride to her destination. When the girl was in the car the men threatened her with a deadly weapon. They refused to take her where she wished to go or to let her out of the car. Then in each case the girl was taken to a distant quiet residential area in the same county where the car was stopped and, under continued threats of violence, she was raped and robbed.

*People* v. *Daniels, supra,* 71 Cal.2d 1119, concerned three convictions of kidnaping to commit robbery. (Pen. Code, § 209.) In each instance the robbery victim was forced to move within her home a distance of between six and thirty feet. Stating (p. 1134), "Indeed, 'It is difficult to conceive a situation in which the victim of a robbery does not make some movement under the duress occasioned by force or fear,'" the court found Penal Code section 209 inapplicable. It was held (p. 1139): "[T]hat the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only 'standstill' robberies . . . but also

those in which the movements of the victim are *merely* incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (Italics added.) The court continued (p. 1140): "Applying this rule to the facts at hand, we conclude that the brief movements which defendants Daniels and Simmons compelled their victims to perform in furtherance of robbery were merely incidental to that crime and did not substantially increase the risk of harm otherwise present. Indeed, when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence, as here, or a place of business or other enclosure—his conduct generally will not be deemed to constitute the offense proscribed by section 209. Movement across a room or from one room to another, in short, cannot reasonably be found to be asportation 'into another part of the same county.' . . ."

*People* v. *Williams* (1970) *supra,* 2 Cal.3d 894, as here, concerned a conviction of *simple* kidnaping, a violation of Penal Code section 207. As pertinent section 207 provides: "Every person who forcibly steals, takes, or arrests any person . . . and carries him . . . into another part of the same county, . . . is guilty of kidnaping."

In *People* v. *Williams, supra,* during the course of a service station robbery, the victims were forcibly obliged to assist in removal of loot within the station. Then, with the robbers remaining behind, they were ordered " 'to walk on down the street,' " which they did until they reached a telephone and reported the robbery. The court applied its previous holding of *People* v. *Daniels, supra,* 71 Cal.2d 1119, stating at page 901: "Although *Daniels* was directed toward a construction of the statute defining aggravated kidnaping (Pen. Code, § 209), it is clear that the considerations therein enunciated are applicable as well to simple kidnaping (Pen. Code, § 207)." It was held, as a matter of law, that the limited forcible movement of the victims was *merely* incidental to the commission of the robbery, and could not "reasonably be found to be an asportation 'into another part of the same county.' " And obviously the movement did not "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself," as required by *People* v. *Daniels, supra.*

We find none of the requirements of *People* v. *Daniels, supra,* and *People* v. *Williams, supra,* for the nonapplication of the kidnaping statutes (Pen. Code, §§ 207, 209) to be existent in the case at bench.

It must reasonably be said that the forcible movement of Miller's victims from well traveled city intersections to more remote areas where his conduct would be unobserved, was not *merely* incidental to his plan

to rape and rob. Such asportation was an important part of his criminal objective; without it the crimes would not have been committed, for obviously the rapes and robberies would not have occurred at the point where the girls entered the automobile or in the near vicinity. The risk of harm to the victims before their asportation was slight. Such risk was "substantially increased" by their movement to secluded spots where violence "above that necessarily present" in the intended crimes would probably go undetected. And certainly the movement of the girls from downtown to residential districts of the Alameda County metropolitan area must be considered asportation "into another part of the same county" as required by Penal Code section 207.

Accordingly we hold that the jury's kidnaping verdicts were supported by substantial evidence, and that it cannot be said, as a matter of law, that the rule of *People* v. *Daniels, supra,* and *People* v. *Williams, supra,* is here applicable.

The conclusion we have reached as to Miller's kidnaping convictions finds support in *People* v. *Thomas,* 3 Cal.App.3d 859, 865-866 [83 Cal. Rptr. 879], and *People* v. *Ramirez,* 2 Cal.App.3d 345, 354-357 [82 Cal.Rptr. 665]. It is also consistent with the holding of *People* v. *Schafer,* 4 Cal.App.3d 554, 560 [84 Cal.Rptr. 464], where one victim was assaulted "a short distance" on the same road from which she was picked up at a traffic light; the second was asported from a road into a large lot. The court found each of the movements to be incidental to assaults upon the victims and not reasonably to be considered a taking "from one part of the county to another."

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 6, 1971.