[Crim. No. 22518. Second Dist., Div. One. Oct. 26, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
STERLING HALL, Defendant and Appellant.

836

## COUNSEL

G. Tom Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Frederick R. Millar, Jr., and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANSON, J.—**

### THE CASE

The defendant Sterling Hall was accused in a twelve-count information of six counts of robbery in violation of Penal Code section 211 and six counts of kidnapping for the purpose of robbery in violation of Penal Code, section 209. Counts I and II of case A-278304 were consolidated as counts XI and XII in case A-277044. Two counts of the information refer to the same incident and victim; the odd numbered counts allege the robbery and the even numbered counts allege kidnapping for the purpose of robbery. Each count further alleges that the defendant at the time of the commission of the offense "was armed with a deadly weapon" and "did use a firearm." Defendant's motion to strike the armed and used allegations in counts V and VI was granted by the trial court.

An amendment to the information alleges that the defendant was convicted on five prior occasions of the crime of robbery in violation of Penal Code section 211. One of the alleged prior convictions occurred on August 12, 1959, another on March 9, 1962. Conviction on three additional counts of robbery was alleged to have occurred on July 14, 1966. The defendant made a motion pursuant to *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], which was granted as to the 1959 and 1962 convictions but was denied as to the three 1966 convictions.

The defendant pleaded not guilty to all twelve counts in the information and admitted the three prior robbery convictions.

The trial, by jury, lasted 15 days including over 2 days of deliberation by the jury. The jury found the defendant guilty of four counts of robbery in the first degree in violation of Penal Code section 211 (counts I, III, V and XI), and guilty of four counts of the crime of kidnapping for the purpose of robbery in violation of Penal Code section 209 (counts II, IV, VI and XII). The jury further found to be true the charges in counts I, II, III, IV, XI and XII that the defendant was "armed" and "did use" a firearm during the commission of the crimes. The jury acquitted the defendant of counts VII, VIII, IX and X.

Defendant's motion for a new trial was denied. The defendant was sentenced to the state prison for the term prescribed by law as to each count of which he was found guilty; the sentences as to the robberies (counts I, III, V and XI) to run consecutively to each other; the additional penalties pursuant to section 12022.5 of the Penal Code in respect to "did use a firearm" (counts I, III and XI) to run consecutively; and the sentences as to the kidnapping for the purpose of robbery (counts II, IV, VI and XII) to run consecutively to each other; however, the sentences as to the kidnapping counts to run concurrently with the sentences on the robbery counts. The trial court stayed the sentences as to the robbery counts pending determination of appeal on the kidnapping counts, with such stay ordered to become permanent upon completion of the sentences as to the kidnapping counts.

Defendant appeals from the judgment.

CONTENTIONS

On appeal defendant contends (1) that the trial court erred in denying defendant's motion to exclude pretrial identification made from police

photographs; (2) that the defendant was erroneously charged and convicted on the counts alleging kidnapping for the purpose of robbery in violation of Penal Code section 209.

FACTS

On six separate occasions a pay telephone coin collector employed by the Pacific Telephone Company was robbed. In each instance the coin collector was alone and using a Pacific Telephone Company truck. The trucks used by the victims were all similar in construction, color and content. Each truck was a two-door closed panel type and painted the distinctive Pacific Telephone color, olive green, with the company's emblem on each door. Inside each truck was a four- or five-foot deep safe. The portion of the safe containing the door, secured by a padlock, protruded inside the cabin part of the truck on the passenger side. The safe contained shelves to hold trays in which the coin receptacles from the pay telephones were placed. Electrical security devices installed in the trucks functioned as follows: In the event an attempt were made to unlock the safe without first turning on the ignition and also pushing a red button hidden under the dashboard, a school-bell type alarm would ring and the lights on the truck would blink and pulsate. In addition, if the truck were started without first pressing the red button under the dash, it would go only a short distance and stall out.

The duties of the coin collectors included not only the collecting of coins from pay telephone booths, but also cleaning the booths and replacing missing and worn out telephone directories. The keys for the pay telephones, the safe and the truck ignition were kept on the same ring. Some of the telephone booths were serviced as frequently as twice a week and others as infrequently as 180 days, depending upon need. Each day the coin collectors periodically reported in by telephone to their supervisor at the home office.

In general, the crimes of which defendant was convicted in counts I, II, III, IV, XI and XII were described by victims Hickerson, Hedlund and Reznikof in the following manner: The coin collector victims were accosted by the defendant after they had completed servicing a pay telephone booth and as they were just entering the passenger door side of the panel truck. In each instance the defendant, a Negro, approached the coin collector, displayed either the handle or the muzzle of a revolver from his shirt or sweater and forced the victims to lie down on the floorboard on the passenger side of the truck. In each instance the victim's eyes were then covered

by either masking tape or by the victim's shirt being pulled over his head. The defendant would then drive the truck to another secluded location to rendezvous with a confederate where the safe was opened and the trays of coins transferred into another vehicle. Victim Adams' testimony as to counts V and VI, of which defendant was convicted, was different in some respects. Victim Adams was accosted by a Caucasian, "Hippie type," and forced by gun point to drive to a secluded manufacturing area, where the defendant was waiting with a U-haul truck with a rag over the license plate, at which time the coin receptacles were transferred to the U-haul truck with the victim forced to assist in emptying the safe; the victim was then tied up in his truck, and the robbers departed. The electrical security devices installed in the trucks, as hereinbefore described, were not activated either because the victims told how they functioned from fear of startling an armed robber or the robber knew how the security devices operated. In each robbery between $2,000 and $3,000 was taken, or a total cash loss to the Pacific Telephone Company, from all six robberies, in excess of $15,500.

The defendant testified at the trial. He does not contend that the robberies in fact did not occur but denies that he committed any of them. He testified that during the time period the robberies were committed he was either at work or going to a doctor for treatment of an injury to his wrist which required his wearing an ace bandage. He contends that by reason of this injury he could not have lifted the heavy trays of coins and the victims would have noticed the bandage.

The prosecution produced evidence to show lack of awareness on the part of defendant's employer as to whether or not the defendant was in fact at work at the time the robberies were committed since he was not personally supervising the work. The employer further testified that he was not aware of any injury to the defendant's wrist. The defendant testified that he did not tell his employer of his injured wrist because he needed the work.

DISCUSSION

*Was the Pretrial Photographic Identification*
*Unduly Suggestive Resulting in Prejudicial Error?*

Defendant first contends that the trial court erred in denying the defendant's motion to exclude the pretrial photographic identification of the defendant by witness Dennis L. Hickerson in that the identification by

photographs was conducted in such a manner as to be inherently unfair and unduly suggestive.[1]

In the instant case, the trial court conducted an extensive hearing, out of the presence of the jury, on this issue. There was extensive cross-examination by defense counsel of Mr. Hickerson regarding any and all viewing by Mr. Hickerson of the defendant, whether in person or by photograph.[2]

The record reflects that prosecution witness Dennis L. Hickerson on May 27, 1971, was robbed of 43 boxes of coins exceeding the value of $2,200 (counts I and II). Mr. Hickerson testified that he saw the defendant Hall on three separate occasions in broad daylight and at close range before he identified the defendant from the photographs shown him by the police.

The first time Mr. Hickerson saw the defendant Sterling Hall was between 1 and 2 p.m. on May 27, 1971, the day of the robbery. He, Hickerson, was entering his panel truck which was parked on Slauson Avenue. The defendant was about 31 feet from him walking toward him. Mr. Hickerson's attention was drawn to the defendant because the defendant's hair "looked kind of odd . . . it was a little straight and kind of sticking up all over the place." Hickerson entered and locked the door of his truck in accordance with company policy but continued to observe the defendant. The defendant stared at him quite a bit as he walked slowly by, within four or five feet of the panel truck.

The second time Mr. Hickerson saw the defendant was later the same day, at about 3 p.m. On this occasion Mr. Hickerson had just collected from a corner pay telephone and was going to his truck. The panel truck

---

[1]The defendant further contends that since Mr. Hickerson was the first to testify his testimony tainted the testimony of the other three victims of the crimes of which defendant was convicted and thus unduly prejudiced the jury, and requests this court to reverse as to all counts or, in the alternative, to reverse the verdict with respect to witness Hickerson and remand the remaining convictions for a new trial.

[2]Before denying defendant's counsel's motion to exclude Mr. Hickerson's identification of the defendant, the court said: "Well, there are actually 11 photographs. The last two are stapled together as People's S-8. If you count that as one, there would be 10. It would seem they are all black, all young, and substantially the same age bracket. From looking at this, in spite of the witness's testimony, it would appear to me that there are, in addition to the defendant's photograph, photographs of two others whose hair seems to have been subjected to some type of process which, if mussed, might stand up in the manner that the defendant's hair is standing up. There has been no testimony that that was the sole identifying characteristic. I don't see anything about this group of mug shots that would be inherently unfair and unduly suggestive. There are a variety of hair styles. He chose the one that looked most like that of the defendant."

was parked on Western Avenue facing north, about 30 feet from the intersection. He saw the defendant about 50 feet in front of the truck walking toward him. The defendant speeded up walking and met him at the passenger side of the truck. The defendant told Mr. Hickerson that he (the defendant) had a gun under his sweater, to get into the truck and lie down on the floorboard. Mr. Hickerson complied. The defendant then entered the truck, shut the door, and sat down in the driver's seat. As the defendant got into the truck he pulled out a gun, what appeared to be a 32-caliber revolver. The defendant then handed Mr. Hickerson a piece of masking tape and told him to put it over his eyes. Mr. Hickerson's eyes remained taped during the time the defendant drove to another location where a confederate was waiting, the safe opened, the coin receptacles transferred to another vehicle and the robbers departed.

The third time Mr. Hickerson saw the defendant, by happenstance, was on June 11, 1971. Mr. Hickerson testified that he was making a left-hand turn at an intersection when he saw the defendant behind the wheel of a 1958 white Ford which was stopped but preparing to make a right-hand turn. Mr. Hickerson passed within three feet of the defendant and testified the defendant "put his hand over his face to keep me from seeing him." Mr. Hickerson took down the license number of the motor vehicle the defendant was driving and gave it to the police, which eventually led to the arrest of the defendant. The witness's testimony that the individual he observed on this third occasion was the same person who had previously robbed him on May 27, 1971 was positive, definite and unshaken on cross-examination.[3]

The record, uncontradicted, reveals that Mr. Hickerson did not identify the defendant from the police photographs until "the last part of June," after the date of June 11, 1971, when he had observed the defendant on the third occasion,[4] that he was not prompted in any way before he viewed

---

[3]Reporter's transcript, cross-examination, page 80, lines 21-25:

"Q Now, later, sometime later in June, you say you saw a party that you thought was the same man that robbed you; is that correct?

"A I saw the party that robbed me. I didn't think. I knew it."

[4]Reporter's transcript, page 95, lines 10-19:

"Q Mr. Hickerson, calling your attention to the time that you were in the police station and you were shown some mug shots—

"That is true? You were, were you not?

"A Yes.

"Q About twelve of them?

"A Yes.

the photographs although he was told they thought they had the man. He identified one picture as the person who robbed him. It was the defendant's picture and he was definite in his identification.[5]

In the case of *People* v. *Guerin* (1972) 22 Cal.App.3d 775, at page 779 [99 Cal.Rptr. 573], the court stated: "It is not contended that a robbery did not take place as alleged; the issue before the trial court was that of identity of the robber.

"Defendant contended in the trial court, and contends here, that his identification by photographs was conducted in such a manner as to be inherently unfair and suggestive. The trial court conducted an extensive hearing on that issue. We have reviewed the record of that hearing. We cannot say that the trial court's determination, adverse to defendant, was without substantial support in the evidence. Under those circumstances, the trial court finding is binding on us. (*People* v. *Hawkins* (1970) 7 Cal. App.3d 117 [86 Cal.Rptr. 428]; *People* v. *Neal* (1969) 271 Cal.App.2d 826 [77 Cal.Rptr. 65].)"

■ Accordingly, for the reasons stated in the *Guerin* case, we conclude that defendant's first contention is not supported by fact or law.

■ The reporter's transcript discloses the other three victims' identification of the defendant was definite and certain in character. Victim Hedlund testified he had a face-to-face, close range confrontation with the defendant when he was first approached; it was broad daylight; there was nothing to obscure a view of the defendant's face. Victim Hedlund made a positive in-court identification.

Victim Adams testified he saw the defendant on two separate occasions: First, he saw the defendant sitting with the Caucasian "Hippie type" man in the bar where he had serviced a pay telephone. The Caucasian "Hippie type" partner followed him to his truck where he was forced to go to

"Q Was this after you had reported the license that you had seen to the police or before?

"A After."

[5]Reporter's transcript, direct examination, page 102, lines 2-10:

"BY MR. PERUZZA:

"Q Sir, after you identified the defendant through the mug shot which you have identified here as People's 2-A, is your identification based solely upon this mug shot, and the fact that you saw the defendant three times and this is the man that robbed you?

"A I saw him three times, and that is the man that robbed me."

another location. At the second location the defendant was waiting with a U-haul truck, at which time victim Adams saw him a second time. His identification of the defendant was definite and certain in character.[6]

Victim Reznikof testified he looked at the defendant several times from under his shirt while the defendant drove to the location to meet his partner.[7] The victim made an in-court identification of the defendant. It is noted also that the jury acquitted the defendant of the incident involving victims Kirby and Stovall (counts VII, VIII, IX and X) although there

---

[6]Redirect examination by Mr. Peruzza, deputy district attorney, R.T., page 164, lines 13-16:

"Q Mr. Adams, it is no doubt in your mind that the gentleman you saw in the van that was collecting the coin boxes is the defendant?

"A No doubt."

and recross examination by Mr. Taylor, counsel for defendant, R.T., page 167, lines 2-6:

"Q You weren't paying too much attention to the person in the van; is that correct?

"A I never forget a face.

"Q Sir?

"A I never forget a face."

[7]Direct examination by Mr. Peruzza, R.T., page 225, lines 13-25:

"Q And then what happened?

"A He drove away with the truck advising me to lay down again and not to look up at him.

"Q Did you look up at him?

"A Occasionally I tried to.

"Q How could you see?

"A Well, I had a buttoned shirt; so I had to unbutton it to pull it up over my head. I kept pulling it over and peeking to see who was driving.

"Q Did anything happen while you were pulling open your shirt and peeking at the defendant?

"A Yes. He noticed me once and told me that he would shoot me if I didn't stop looking at him."

and R.T., page 226, lines 6-23:

"Q Then what happened, sir? Did the truck eventually come to a stop?

"A Yes. I tried to notice how he was driving or whatever. I noticed he made a certain—well, he wasn't on one road the whole time. He made a few turns left and right, and I noticed all of a sudden that the lighting changed around me.

"Q What do you mean by that?

"A Well, as if we had come underground or a garage of some sort.

"Q And then what happened when the light changed?

"A Well, I could barely look up through the windshield and look up through the ceiling without looking at him, and I saw that we were under—well, I thought it was in some sort of a carport or garage. I saw stucco surface on the ceiling.

"Q Did you look in the defendant's face when he turned around to see who he was addressing?

"A Yes, I did."

were similarities in mode of conducting the robberies, but apparently due to weak identification of the defendant, and the jury was obviously not influenced as to these counts by Mr. Hickerson's testimony.

*Were the Kidnapping Convictions Proper?*

We next address ourselves to the defendant's other contention that he was erroneously charged and convicted of four counts of kidnapping for the purpose of robbery in violation of Penal Code section 209. The defendant relies primarily on the case of *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].

In the *Daniels* case the California Supreme Court rejected a construction of the kidnapping statutes under which any forcible movement of a robbery victim, no matter how brief or for what purpose, was deemed ipso facto to transform the robbery into the offense of kidnapping. The court abrogated the former fact, not the distance of forcible movement rule to constitute kidnapping, and held that movements of robbery victims which "are merely incidental to the commission" of the underlying crime and did not "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself" are not punishable under section 209 of the Penal Code.

Therefore, the test is not merely mileage but requires the answering of two criteria as established by *Daniels,* i.e. whether or not under the circumstances of each case (1) the movements were merely incidental to the commission of the robberies and (2) whether or not the movements of the victims substantially increased the risk of harm over and above that inherent to the crime of robbery itself.

In the case at bench, each of the four victims was forcibly moved a distance through traffic, while forced to lie or sit on the floorboard blindfolded, from a well-traveled city intersection to a secluded area. In each instance the robber was armed with a pistol.

Mr. Hickerson (count II) was moved a distance of about 10 blocks. In addition, Hickerson testified that he felt the passenger door open and reached out to grab the door in order to keep from falling out, at which time the robber stuck a two-inch snubnosed 38 blue steel revolver (observed out of the bottom of the tape) in his stomach and told him not to pull any tricks. Victim Hedlund (count IV) was moved a distance of three or four blocks, blindfolded, under the same general conditions as described by victim Hickerson. Mr. Adams (count VI) was first accosted by defendant's

partner in the crime (a Caucasian—"Hippie type") and forced to drive for about three-quarters of a mile. He, Adams, had a gun placed at his head during part of this ordeal. Furthermore, he was left bound in his truck so that when he tried to free himself, he fell out of the truck. Mr. Reznikof (count XII) was moved, forcibly, under similar circumstances for about 10 minutes and for several miles. He was threatened with pistol whipping and shooting by the robber.

In *People* v. *Miller* (1970) 12 Cal.App.3d 922, 933-934 [91 Cal.Rptr. 97], in affirming a judgment in which defendant was found guilty, by a jury trial, of two counts of rape, two counts of robbery and two counts of kidnapping, the court, finding none of the requirements for nonapplication of the kidnapping statutes, stated at pages 933-934: "It must reasonably be said that the forcible movement of Miller's victims from well traveled city intersections to more remote areas where his conduct would be unobserved, was not *merely* incidental to his plan to rape and rob. Such asportation was an important part of his criminal objective; without it the crimes would not have been committed, for obviously the rapes and robberies would not have occurred at the point where the girls entered the automobile or in the near vicinity. The risk of harm to the victims before their asportation was slight. Such risk was 'substantially increased' by their movement to secluded spots where violence 'above that necessarily present' in the intended crimes would probably go undetected." See also *People* v. *Stathos* (1971) 17 Cal. App.3d 33, 39 [94 Cal.Rptr. 482].

In *People* v. *Curtis* (1971) 21 Cal.App.3d 704, 708 [98 Cal.Rptr. 775], the court stated: "Here the asportation of Charles and Mrs. Carter to a dark, deserted spot under the freeway substantially increased the risk of harm to them over and above that necessarily present in the crime of robbery itself. It is true the jury found there was no bodily harm as a result of the kidnaping but it is fairly obvious that defendants had not only the means of inflicting serious injury, even death, but the perfect place in which to do it, and the risk of harm to which the victims were subjected in the event defendants were frustrated in their criminal act was substantial and very real."

In *People* v. *Milan* (1973) 9 Cal.3d 185, the court said at page 193 [107 Cal.Rptr. 68, 507 P.2d 956]: "The asportation gave rise to dangers, not inherent in robbery, that a traffic collision would occur and that as a result of the motion of the car the gun would accidentally discharge. The

fact that neither of these dangers materialized, of course, does not mean that the risk of harm was not substantially increased by the asportation."[8]

"Our function on appeal is not to reweigh or reinterpret the evidence but simply to determine whether there is sufficient evidence in the record to warrant the inference of guilt drawn by the trier of fact. (*People* v. *Bradford* (1969) 70 Cal.2d 333, 341 [74 Cal.Rptr. 726, 450 P.2d 46]; *People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)" (*People* v. *Perry* (1972) 7 Cal.3d 756, 785, fn. omitted [103 Cal. Rptr. 161, 499 P.2d 129].)

■ The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt (*People* v. *Williams* (1971) 5 Cal.3d 211, 214 [95 Cal.Rptr. 530, 485 P.2d 1146]; *People* v. *Bynum* (1971) 4 Cal.3d 589, 599 [94 Cal.Rptr. 241, 483 P.2d 1193]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Newland* (1940) 15 Cal.2d 678, 680-683 [104 P.2d 778]), viewing the evidence in the light most favorable to respondent and presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People* v. *Mosher, supra,* 1 Cal.3d 379, 395; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

■ The court properly instructed the jury on the criteria set forth in the *Daniels* case.[9] Whether a defendant is a "kidnapper" under the particular circumstances of each case is determined by evaluating the above

---

[8]See also *People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905], in which the victim was forced at gun point to lie on the floor of the cab of his truck as it was driven through city traffic.

[9]"Any person who, with the specific intent to commit robbery, kidnaps any individual, is guilty of the crime of kidnaping to commit robbery.

"The specific intent to commit robbery must be present when the kidnaping commences.

"Robbery is the taking of personal property of any value in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear and with the specific intent permanently to deprive the owner of his property.

"Kidnaping is the unlawful compulsion of another person against his will and without his consent and because of a reasonable apprehension of harm, to move for a substantial distance where such movement is not merely incidental to the commission of the robbery and where such movement substantially increases the risk of harm to such person over and above that necessarily present in the crime of robbery itself."

criteria and is normally and primarily a question of fact. (*People* v. *Beaumaster* (1971) 17 Cal.App.3d 996 [95 Cal.Rptr. 360]; *People* v. *Moreland* (1970) 5 Cal.App.3d 588 [85 Cal.Rptr. 215].) ■ Being a question of fact for the jury, the jury impliedly concluded that defendant was guilty of the four kidnapping and robbery counts of which he was convicted, taking into consideration the criteria established by *Daniels*.

We hold that there is substantial evidence for the jury to conclude, as to each of the four victims, that the asportation was not merely incidental to the robberies and that the risk to each of the four victims was "substantially increased" in accordance with the requirements of *Daniels*.

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.