[Crim. No. 11209. Fourth Dist., Div. One. July 30, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES HAROLD YORK, Defendant and Appellant.

COUNSEL

Appellate Defenders, Inc., under appointment by the Court of Appeal, and Paul Bell for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Richard D. Garske and Patricia D. Benke, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

STANIFORTH, J.—After unsuccessful motions to suppress evidence and an identification of defendant James Harold York as impermissibly suggestive, a jury convicted York of first degree burglary (Pen. Code, § 459) and assault with a deadly weapon and by means likely to produce great bodily harm (Pen. Code, § 245, subd. (a)).

After a Penal Code section 1203.03 diagnostic study of York at Department of Corrections, Chino, York was returned and sentenced to the upper term of four years on the assault with deadly weapon charge. The sentence imposed on the burglary charge was stayed as required by Penal Code section 654.

On appeal York contends (1) he was arrested without probable cause after an unreasonably long detention; (2) a military police showup which included one black suspect was impermissibly suggestive as to deny due process; (3) his confession was obtained without proof beyond a reasonable doubt that his waiver of *Miranda* rights was voluntarily intelligently given; and (4) his subpoena duces tecum for production of the Chino diagnostic study documents was improperly quashed.

FACTS

In the early morning hours of May 3, 1978, Mrs. Faye Osuna was awakened by the noise of her television in the front room of her Oceanside home. She saw York, a black man, standing by a table going through her purse. She asked him what he was doing there. He answered, "You invited me in, baby." Mrs. Osuna told the invader she was going to get her husband and moved toward the staircase of her apartment; she called upstairs.

York picked up a black belt from a table and approached Mrs. Osuna, attempted to put the belt around her throat. A struggle ensued

with York sitting astride and choking Mrs. Osuna with his hands until she almost passed out. Mrs. Osuna, however, was able to scream. Her daughter and son-in-law, Mr. and Mrs. Ayers, came down the stairs and confronted the assailant. York said, "Don't come any closer" and fled.

Mrs. Osuna immediately called the police, gave a detailed report of the events and description of the assailant. The police promptly arrived, questioned the victim, broadcast the details on the police radio system.

Within minutes after the assault on Mrs. Osuna, Oceanside Police Officer Johnston observed York, a short distance from the Osuna residence, running across Hill Street toward First. York was bleeding from a scratch on the face. Officer Johnston was not yet aware of the just completed burglary-assault at the nearby Osuna home, but he stopped York for this reason: Approximately 15 minutes before the encounter with York, the officer had received a radio report of a prowler attempting to break into a house in the immediate vicinity. The prowler was described as "a male Negro, a possible military type being about 5′ 10″." York fit this general description. Officer Johnston detained York, questioned him as to his scratched, bleeding face. York claimed he was mugged by several black males. When asked why he did not flag down, seek help from the officer, York stood mute.

After questioning York and filling out a field interrogation card, Johnston placed York—a United States Marine Corps member—in the custody of the military police. His articulated reasons?—York's injuries and the likelihood of his being the just reported prowler.

Immediately upon surrendering York into the custody of the military police, Officer Johnston learned via police radio of the crimes at the Osuna residence. He called the Osuna residence and told Investigative Officer Conger the military police had a suspect in custody. Officer Conger promptly drove Mrs. Osuna and Mr. and Mrs. Ayers to the military police shack where the witnesses stood outside the shack, looked through a small window. Mrs. Osuna identified the only black man in the room as her assailant. Mrs. Ayers, after her mother's identification, also identified York as the intruder. Mr. Ayers could not identify York. These identifications at the military police shack oc-

curred within 20 minutes after York fled Mrs. Osuna's apartment. York was then arrested.

At about 5:20 that morning, Detective John Gallardi admonished York of his *Miranda* rights, received a waiver. York confessed to the burglary and assault on Mrs. Osuna.

## DISCUSSION

### I

■ York concedes the propriety of his original stopping and questioning as conforming to the rules of *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957], but argues the detention was unreasonable in length, extending beyond what was reasonably necessary under the circumstances (*People v. Harris* (1975) 15 Cal.3d 384, 390 [124 Cal.Rptr. 536, 540 P.2d 632]). He complains his transfer into custody of the military police was beyond the scope of permissible detention. The trial court found—based on all the circumstances surrounding York's detention and the first report of a prowler's attempted burglary—and the description given of that prowler, there was "objective probable cause to arrest the defendant...."

The Supreme Court recently again defined the standard for probable cause to arrest in these words: "Cause for arrest exists when the facts known to the arresting officer 'would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' [Citations.]" (*People v. Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) In similar fashion, the Supreme Court held: "Probable cause to arrest without a warrant represents an *objective* legal standard by which to measure the reasonableness and sufficiency of the officer's *subjective* beliefs that the defendant has committed an offense. [Citations.]" (*People v. Miller* (1972) 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228].) (See *People v. Frierson* (1979) 25 Cal.3d 142, 169 [158 Cal.Rptr. 281, 599 P.2d 587].)

Here the record establishes that Officer Johnston possessed that requisite subjective belief and an honest and strong suspicion York was the

prowler just reported. Officer Johnston stated he called the military police "due to his [York's] injuries and the fact that he was a good possibility of being the prowler that was in the area." Johnston intended the military police take custody of him. York argues the report of a "possible military type" excluded him, refuted the existence of probable cause to arrest. Officer Johnston had a report of an attempted burglary immediate in time and place to the stopping. York, with bleeding face, without belt, was running one street over from the crime site. York's (non)response to a reasonable question as to why he did not seek aid after a claimed mugging raised further grounds for suspicion. We do not have York before us. The trial court did. The inference supporting the trial court's conclusion is that Marine York was of a "military type." Judged by the objective standard announced in *Miller, supra*, the facts known to, perceived by Officer Johnston after stopping and questioning of York are substantial in nature and support the court's finding of probable cause to arrest.

If we assume that the facts do not support a finding of probable cause to arrest, the premature—by 15 minutes—taking of York into custody gives rise to no Fourth Amendment violation. There was no evidence of a suppressible product of this—if we admit it to be—premature arrest. York's identity cannot be suppressed, for it was lawfully obtained in a conceded constitutionally correct stop/questioning. In *People v. McInnis* (1972) 6 Cal.3d 821 [100 Cal.Rptr. 618, 494 P.2d 690], the accused was photographed by police following his illegal arrest. The photograph was later used in his identification by a witness. In response to a contention that the identification was invalid, the Supreme Court stated (p. 826): "To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are 'fruits of the poisonous tree' would not merely permit the criminal 'to go free because the constable has blundered' (Cardozo, J., in *People v. Defore* (1926) 242 N.Y. 13, 21...) but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested:...As declared in *United States v. Edmons* (2d Cir. 1970) 432 F.2d 577, 584: 'We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent custody must inevitably be excluded.'"

Again assuming these facts are examined and found short of probable cause to arrest, yet the totality of circumstances warranted a more ex-

tended detention than a mere street identification and immediate release. The officer had a victim report of a crime immediate in time and place and a running suspect who met the general description of the wrongdoer. These facts authorized, at minimum, detention pending an in-the-field identification by the prowler's victims. It was not unreasonable to turn York over to the military custody to achieve this end. York's contention is without merit.

## II

■ York contends that his identification by the victims at the military police shack was "impermissibly suggestive." Here the witnesses-victims identified York within 20 minutes of the crimes being committed. The police are not to be criticized for attempting to establish the identity—or nonidentity—of the suspect as promptly as possible. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 714 [83 Cal.Rptr. 608, 464 P.2d 64].) The rationale supporting the validity of the prompt curbside "single person," "one on one" showup is found in *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967], holding such procedure not inherently unfair. In *Stovall* v. *Denno, supra*, the identification circumstances held proper were remarkably akin in critical aspects to those complained of here. Stovall, a black man, was taken, handcuffed to a policeman, in company with four other policemen and two prosecuting officers—all white—into a hospital room where the victim identified Stovall as her assailant. The time lapse in *Stovall, supra*, between the crime and identification was markedly greater than here but the black in company of whites is an identical factor. (See also *People* v. *Hunt* (1977) 19 Cal.3d 888, 893 [140 Cal.Rptr. 651, 568 P.2d 376]; *People* v. *Irvin* (1968) 264 Cal. App.2d 747, 760 [70 Cal.Rptr. 892].)

The trial court's determination that the process was fair, complied with due process will be sustained on appeal if supported by substantial evidence. (*People* v. *Hall* (1973) 34 Cal.App.3d 834, 843 [110 Cal.Rptr. 440].) Not only is there closeness in time—20 minutes at most—between the crime and identification of the assailant, but the witnesses each had a reasonable opportunity to view York. Mrs. Osuna, albeit frightened, observed York at close range for at least three minutes. The daughter had a shorter time—estimated at less than a minute—to fix York's features in her consciousness. Where the confrontation occurred as here, within a few minutes after the crime, the

issue is whether the circumstances of that confrontation were unduly suggestive.

When the charge of unfairness in the showup confrontation is made, the burden is on the complaining defendant to establish the facts supporting a conclusion of unfairness and the confrontation resulted in such unfairness as to give rise to a substantial likelihood of misidentification thereby infringing upon his due process rights. (*People v. Hunt, supra,* 19 Cal.3d 888, 893; *People v. Caruso* (1968) 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336]; *People v. Hawkins* (1970) 7 Cal. App.3d 117, 122 [86 Cal.Rptr. 428].)

While York was the only black man in the military police shack when the identifications were made, yet this element must be balanced against other factors supporting the need for and justification of the prompt confrontation. York points to no fact making the identification an unfair procedure. Nor has York shown such procedure resulted in essential unfairness in his trial as a demonstrable reality. Even in the station house lineup, there is no requirement that the defendant in the lineup must be surrounded by people nearly identical in appearance. A fortiori, such requirement is not the "sine qua non of lineup fairness" in the one-to-one curbside identification setting. (See *People v. Blair* (1979) 25 Cal.3d 640, 661 [159 Cal.Rptr. 818, 602 P.2d 738].)

York has failed to meet his burden of showing that the identification process at the military police shack was unfair or that the "one-to-one" showup within 20 minutes of the crimes' commission did in any way taint the later station house—conceded to be fair—lineup, where York was again identified as the assailant.

### III

York next asserts his confession was made under the influence of alcohol, therefore there was no intelligent, voluntary waiver of *Miranda* rights. The officer confirms York had been drinking but was not intoxicated. York requested to talk to a detective. Officer Gallardi then read York his *Miranda* rights and York said he understood and was willing to talk about the Osuna incident. York described the events at the Osuna home in detail. His version confirmed Mrs. Osuna's account.

■ The rule is stated in *In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633]: "A confession is involuntary unless it

is 'the product of a rational intellect and a free will.' [Citations.]...The only issue is whether the accused's abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice. [Citation.] To determine this issue, the 'totality of circumstances' [citations] surrounding the interrogation must be considered."

From all of the evidence presented, the trial court could reasonably conclude that York did understand his *Miranda* rights and did intelligently, voluntarily waive those rights. There is no hint that York was threatened or promised anything for his statement. ■ The trial judge's ruling on voluntariness of a confession will not be disturbed as long as there is substantial evidence in support of the ruling. (*People* v. *Lara* (1967) 67 Cal.2d 365, 392 [62 Cal.Rptr. 586, 432 P.2d 202].)

A wealth of substantial evidence supports the court's conclusions.

## IV

York, for the first time on this appeal, complains of the trial court's failure to articulate the standards upon which its finding of voluntariness of York's jailhouse confession was made. An examination of the record confirms York's underlying factual assertion. However, this issue was never raised with the trial court. The scope of the issues tendered by York's suppression motion is framed in the following colloquy: "THE COURT: And you are hoping, also, to suppress his statements?

"MR. THOMPSON: Yes. In addition to the Sixth and Fourteenth Amendment issues, *we are going to raise Fifth Amendment issues based upon the fact that he was in custody at the time that he was confronted on the street, that his silence was an implied attempt to exercise his Fifth Amendment privilege, and that once he attempted to exercise that privilege, no further questions should have been propounded irrespective of the Miranda warning.* That is going to cover the entire procedural spectrum of the case." (Italics added.)

■ York is precluded from raising this question on appeal by reason of his failure to preserve the issue by appropriate objection or request in the trial court. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 547 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Maynarich* (1978) 83 Cal. App.3d 476, 480 [147 Cal.Rptr. 823].) Had York made the appropriate motion and request, then this court would have the benefit of the trial

court's subjective analysis. However, an examination of the entire record of events surrounding York's confession does support the trial court's finding of voluntariness by the requisite degree of proof. York testified to drunkenness, a lack of memory of events, yet the entire course of events from 2:30 a.m. to 5 a.m. belies York's contention. The evidence was overwhelming of York's ability to talk, aggressively attack Mrs. Osuna, run several blocks, talk coherently to Police Officer Johnston. Two and one-half hours after the crime, York gave a detailed confession of his crime which coincided with Mrs. Osuna's recollection. It is not reasonably probable the court would have determined differently had it articulated the standard to be used at the time it made its determination of voluntariness. If we assume error, reversal is not required. (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)

V

■ Finally, York argues the trial court erroneously quashed his subpoena duces tecum to produce his case file and documents compiled in connection with his Penal Code section 1203.03 "90-day study" at a Department of Corrections facility. Since his moving papers complied with Code of Civil Procedure section 1985, he asserts due process required the producing of the records sought.

Section 1985 of the Code of Civil Procedure provides in pertinent part: "A copy of an affidavit shall be served with a subpoena duces tecum issued before trial, showing good cause for the production of the matters and things described in such subpoena, specifying the exact matters or things desired to be produced, setting forth in full detail the materiality thereof to the issues involved in the case, and stating that the witness has the desired matters or things in his possession or under his control."

York's subpoena duces tecum sought: "All writings, written memoranda, personal notes and written memorialization, including entire case file, on inmate James Harold York." This request was particularized by the accompanying affidavit which was required to be served with the subpoena. Item number 5 in the declaration states in part that "[t]he defendant requires the case file, or written documentation concerning the 'staff committee's' impressions and factual basis for their conclusions, and the procedure used in making the above referenced recommendations." This affidavit viewed in conjunction with the sub-

poena duces tecum complies with the principal reason for requiring specificity, to wit, to give the custodian notice of what records are desired. (*Grannis v. Board of Medical Examiners* (1971) 19 Cal.App.3d 551, 565 [96 Cal.Rptr. 863].)

The People rely on *People v. Arbuckle* (1978) 22 Cal.3d 749 [150 Cal.Rptr. 778, 587 P.2d 220], as authority to quash the subpoena duces tecum. That case is distinguishable. Arbuckle was committed to the Department of Corrections for a study pursuant to Penal Code section 1203.03. The report recommended a prison sentence. Arbuckle then *sought to subpoena employees* of the Department of Corrections in order to determine whether their conclusions were correct, and to examine the methodology they had used in reaching their conclusion. The Supreme Court held: "There is no statutory support for the asserted right to confront and cross-examine as witnesses those who prepare a report which, pursuant to section 1203.03, must contain a diagnosis and recommendation in writing." (*Id.*, at p. 754; fn. omitted.)

The Supreme Court in *Arbuckle* emphasized the heavy burden "drain on time and public resources" which would be imposed on the Department of Corrections if *personnel*, rather than papers, were subject to subpoena for the purpose of investigating the preparation of Penal Code section 1203.03 reports. (*People v. Arbuckle, supra*, 22 Cal.3d 749, 755.) Such reasoning has no application here. York seeks only documents, records, not witnesses. The People's argument that preparation of a response to a subpoena duces tecum is time consuming is not responsive to due process consideration.

The right of a defendant in a criminal proceeding to the use of the subpoena, subpoena duces tecum, to compel production of witnesses, documents is grounded upon due process rights found in the California Constitution, article I, section 15. The means of implementation of the constitutional rights, the production of such evidence, is detailed in section 1985 et seq. of the Code of Civil Procedure and section 1326 et seq. of the Penal Code.

The material requested, if in existence, has already been reduced to some form of writing. If it is lost or not existent, it of course cannot be produced. No in-court appearances would be required of the Department of Corrections personnel absent special considerations. Evidence Code section 1280 permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity

and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness. (Evid. Code, § 1280, West's Ann. Code, Law Revision Com. com., p. 316.)

The documents sought in this case could reveal facts to aid the sentencing court in determining the sentence, the term to be imposed on York. Moreover, York sought to challenge the foundations, the fairness of the "staffing committee" report. This is not an irrelevant excursion. It does not involve consideration of an extraneous issue. Fundamental fairness requires that information used by the court in a matter as serious as York's commitment to prison be reliable (*People v. Peterson* (1973) 9 Cal.3d 717, 726 [108 Cal.Rptr. 835, 511 P.2d 1187]) and be available not just in conclusionary form. Its reliability should be subject to critical examination by a defendant whose liberty is about to be admeasured.

In *Kenney v. Superior Court* (1967) 255 Cal.App.2d 106, 110 [63 Cal.Rptr. 84], the court noted: "Authorities antedating the modern discovery laws of 1958 have held that allegations in affidavits on the basis of which the issuance of a subpoena duces tecum in connection with depositions are sought are insufficient if issued when made on information and belief. These cases are collected in *Procter & Gamble Mfg. Co. v. Superior Court*, 124 Cal.App.2d 157, at page 161 . . . . The language of Code of Civil Procedure section 1985, requiring specification of 'the exact matters or things desired' seemingly connotes a rigidity which lends sustenance to those earlier authorities. But the broadening of the scope of discovery both by statutory and case law since the enactment and original interpretation of section 1985 makes the earlier cases of little value. And, as a practical matter, how is a plaintiff ever to learn of the existence of these perhaps important sources of evidence vital to his cause except through information and belief? The aim of discovery is the ascertainment of truth—which is the aim of the court."

Under the circumstances here presented, the good cause requirements of Code of Civil Procedure section 1985 are governed by the liberal standards of Code of Civil Procedure section 2031 (*Shively v. Stewart* (1966) 65 Cal.2d 475, 481 [55 Cal.Rptr. 217, 421 P.2d 65, 28 A.L.R.3d 1431]) the objective of which is not merely the discovery of admissible evidence but also effective preparation for a contested hearing. (*Associated Brewers Distr. Co. v. Superior Court* (1967) 65 Cal.2d 583, 587 [55 Cal.Rptr. 772, 422 P.2d 332].)

Given the minimal demand on the Department of Corrections to produce the file and documents which may bring to light the factual base upon which their diagnostic recommendation was made to send York "a first time offender" to prison, the trial court's quashing the subpoena duces tecum was an abuse of discretion.

The judgment of conviction is affirmed. The matter is remanded solely for resentencing in conformity with the views expressed herein.

Brown (Gerald), P. J., and Cologne, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 8, 1980. Mosk, J., was of the opinion that the petition should be granted.