Filed 11/20/15  P. v. Trujillo CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>APRIL CRYSTAL TRUJILLO,<br><br>    Defendant and Appellant. | F068133<br><br>(Super. Ct. No. BF136687A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Michael A. Canzoneri, Deputy Attorneys General, for Plaintiff and  Respondent.

-ooOoo-

April Crystal Trujillo (Trujillo) appeals from her felony convictions for causing bodily injury while driving under the influence of alcohol and driving with a blood

alcohol content of 0.08 percent or more. Trujillo ran a red light while so impaired and hit another car, seriously injuring its three occupants.

Trujillo argues the trial court should have excluded her admission to an investigating officer that she was driving the vehicle at fault because the officer did not provide required *Miranda*[1] warnings when questioning her. We find no error because Trujillo had previously waived her rights in response to a proper *Miranda* advisement, and readvisement was unnecessary under the circumstances.

Next, in challenging her sentence, Trujillo argues the trial court's failure to order a diagnostic evaluation pursuant to Penal Code[2] section 1203.03 was an abuse of discretion. Since the trial court had more than sufficient information to reach a just disposition in this matter, we find no error under section 1203.03. Trujillo also argues the court erred in denying probation and in failing to strike, pursuant to section 1385, one or more of the great-bodily-injury enhancements the jury found to be true. Again, we find no error because the trial court considered appropriate mitigating and aggravating factors and reasonably declined to grant probation and to strike any of the great-bodily-injury enhancements. Accordingly, we affirm the judgment.

## *FACTS AND PROCEDURAL HISTORY*

On May 22, 2012, Trujillo was charged by felony information with driving under the influence of alcohol and causing bodily injury (Veh. Code, § 23153, subd. (a)) and with driving with a blood alcohol content of 0.08 percent or more and causing bodily injury (Veh. Code, § 23153, subd. (b)). The information also alleged, in relation to both counts, two enhancements pursuant to Vehicle Code section 23558 (causing bodily injury to more than one person); one enhancement pursuant to section 12022.7, subdivision (b) (causing great bodily injury resulting in a victim becoming comatose); and three

---

[1]*Miranda v. Arizona* (1966) 384 U.S. 436.

[2]Subsequent statutory references are to the Penal Code unless otherwise noted.

enhancements pursuant to section 12022.7, subdivision (a) (causing great bodily injury to an individual). Trujillo pleaded not guilty to the charges and denied the enhancements. The case proceeded to jury trial.

The incident underlying the charges was a two-vehicle traffic accident at the intersection of White Lane and Gosford Road in Bakersfield. The accident occurred about 11:45 p.m. on April 23, 2011. Trujillo was the driver and sole occupant of a white, Ford F-150 truck. Earlier that evening, she had spent a couple of hours at a Mexican restaurant called La Cabana, where she had eaten a few tacos and consumed five, 22-ounce beers, four shots of liquor, and one mixed drink. She was 23 years old at the time.

The other vehicle involved in the accident, a black Pontiac Grand Am, had three occupants: Giovanni Perez was the driver, and Vicki Piceno and Janet Rodriguez were passengers. The three, all teenagers, were en route to a Fastrip gas station at the intersection of White Lane and Gosford Road, where Rodriguez was meeting her boyfriend, Julio Garcia.

In the moments leading up to the crash, Trujillo was driving eastbound on White Lane, heading toward the intersection with Gosford Road. Jennifer Baker was also driving eastbound on White Lane at the same time, going about 55 miles per hour. Baker testified that, approximately eight-tenths of a mile from the intersection with Gosford Road, a white pickup truck passed her "going incredibly fast." The white truck "came out of nowhere"; it was going "a good 70 to 80 miles an hour." As the truck came up behind her, it almost hit her but then "erratically moved over" to the fast lane. Baker saw the light for eastbound traffic on White Lane, at the intersection with Gosford, was red. She hoped the truck would not run the red light, but it did, and "there was a collision."

Another witness, Linda Mahan, testified that the black Grand Am was heading westbound on White Lane. Approaching the intersection with Gosford Road, the Grand Am stopped in the left-turn lane and waited for the turn signal to turn green in order to turn left onto southbound Gosford. Mahan was directly behind the Grand Am; she also

3.

intended to make a left turn when the turn signal changed to green. After the left-turn signal changed to green, the Grand Am entered the intersection, followed by Mahan. The white truck driven by Trujillo was simultaneously approaching the intersection. Although the traffic signal was red for eastbound traffic on White Lane, the truck did not stop. Mahan braked when she saw the truck speed into the intersection. She flashed her lights and honked her horn to warn the driver of the Grand Am about the approaching truck, to no avail. The truck slammed into the Grand Am with a "tremendous noise," and Mahan saw the latter get "pushed all the way out of the intersection." The Grand Am eventually came to rest against a telephone pole. Mahan could see that the truck had only one occupant—the driver.

Passersby rushed to the scene upon hearing the crash. One of the people who came to the scene was Julio Garcia, Janet Rodriguez's boyfriend, who was waiting for her in the parking lot of the Fastrip located at the intersection. Garcia testified that he did not immediately realize his girlfriend was in one of the cars involved in the collision. He saw the white truck rolling to a stop; it stopped about 20 feet away from where he was standing. He saw Trujillo exit from the driver's-side door just before he realized that his girlfriend was injured in the collision. His girlfriend was lying on the sidewalk, having been flung from the Grand Am in the crash.

Matthew LeGrand pulled up to the Fastrip parking lot at Gosford Road and White Lane just after the collision. He testified that he saw a white truck with front-end damage, a woman lying on the sidewalk, and the Grand Am at rest against a telephone pole. While watching the scene, he noticed Trujillo looking in the truck, trying to find something. She was going back and forth between the white truck and the woman lying on the sidewalk. Eventually, she told LeGrand that she needed to reach someone and gave him a couple of phone numbers to call. LeGrand asked her if she was okay and she said, "no"; he also asked if she was driving and again she said, "no."

Perez, Piceno, and Rodriguez were taken for emergency medical treatment. Perez suffered a broken collarbone, a collapsed lung, and multiple areas of bleeding into his brain. By the time he was admitted to the hospital's emergency department on the morning of April 24, 2011, he was in a coma. Perez remained in a coma until the end of June or early July 2011. At the time of trial, two years later, his condition had improved but it was difficult for him to move and he used a wheel chair. He also had cognitive impairment but was able to hold simple conversations. Rodriguez suffered a bruised lung, a fractured femur, and fractures of the supporting bones for her lower-back vertebrae. She eventually had a metal rod inserted in her leg, which caused her pain during cold weather. Piceno suffered bruised lungs as well as fractures of her top rib on the right side, breastbone, and the supporting bones for her lower-back vertebrae. Piceno had ongoing difficulties with her pelvis at the time of trial.

Bakersfield Police Officer Jerry Whisenhunt responded to the scene to conduct a traffic investigation. Officer Whisenhunt testified that Trujillo was "hysterically upset, crying, kept looking at the two vehicles, looking at what was going on." He observed that Trujillo had striations on the left side of her neck that were consistent with a "seat belt burn" injury. Trujillo stated, "'I was driving the white truck,' and she pointed toward the white truck which was on the southeast corner on the sidewalk in the grass area"; she also told him that she was the only person in the truck.

In talking to Trujillo, Officer Whisenhunt noted a strong odor of alcohol coming from her breath and person; he also observed she was unsteady on her feet and had red, watery eyes. In light of these facts, Officer Whisenhunt conducted a preliminary alcohol screening (PAS) test on Trujillo; the test results indicated that she had a blood alcohol concentration (BAC) of 0.26 percent. He then arrested Trujillo on suspicion of driving under the influence of alcohol, handcuffed her, and placed her in his patrol car. Trujillo consented to a chemical blood test, and, about 12:30 a.m. or 12:45 a.m., Officer Whisenhunt left the scene to take her to Kern Medical Center to have her blood drawn

5.

and to have her medically examined and cleared so she could be booked into the county jail. Trujillo's blood was drawn at 1:15 a.m.; the results of the blood test subsequently demonstrated that Trujillo's BAC was 0.26 percent. Officer Whisenhunt testified that, based on his training and experience, he believed Trujillo was intoxicated at the time of the accident.

After Trujillo was medically cleared, Officer Whisenhunt escorted her to his patrol car to take her to the county jail. As he sat in the driver's seat and she in the back seat, he advised her of her constitutional rights pursuant to *Miranda* and interviewed her for a minute or two. Trujillo was not upset or crying anymore; she said she understood her rights and agreed to talk to him. She was very cooperative and readily responded to his questions. Trujillo admitted that she had been at La Cabana between about 8:00-8:30 p.m. and 10:00 p.m. and had drunk five beers (approximately 22 ounces each), four shots of a liquor, and one mixed drink. She remembered leaving La Cabana and driving eastbound on White Lane to a convenience store at White Lane and Ashe but had no memory of leaving the store. Trujillo remembered being in a collision, but she did not remember her direction of travel or speed, the lane she was in, whether the signal was green or red, or any other contextual details. Officer Whisenhunt then drove Trujillo to the Bakersfield Police Department for further questioning by Officer Daniel Wells. Trujillo was booked into jail at 4:30 a.m.

Bakersfield Police Officer Daniel Wells performed a collision reconstruction investigation upon arriving at the scene at approximately 1:55 a.m. on April 24, 2011. Officer Wells testified that he investigated the "dynamics of the crash" and was designated as an accident reconstruction expert by the prosecution. Based on the "damage to both vehicles and witness statements," he concluded that the "front of the Ford F-150 struck the right rear quarter panel of the Grand Am." As part of his

investigation, he interviewed Trujillo in the "squad room" at the police department; she was under arrest and in handcuffs at the time.[3]

When Officer Wells "first made contact" with Trujillo, before he gave her *Miranda* warnings, he asked her whether she was the driver of the white truck; she told him she was. Officer Wells then gave her *Miranda* warnings and questioned her about the details of the crash. Trujillo stated that she understood her rights but agreed to talk to him. She appeared intoxicated but was able to communicate with him. She told the officer she remembered the collision and the point of impact, but nothing before or after that point. The interview lasted approximately one minute. In a hearing pursuant to Evidence Code section 402, which the court conducted to clarify the timing of the *Miranda* advisement given by Officer Wells, he explained that he asked Trujillo whether she was the driver, prior to advising her of her rights, because he was merely confirming that she was the person he needed to interview.

Defense counsel moved to exclude Officer Wells's testimony that Trujillo told him she was driving the white truck. Counsel argued that Trujillo's admission was obtained in violation of *Miranda*. The court found the testimony was admissible, noting that Trujillo's prior waiver of rights, when questioned by Officer Whisenhunt in his patrol car, was reasonably contemporaneous with the subsequent questioning by Officer Wells.

Ultimately, the jury found Trujillo guilty on both counts charged in the information. The jury also found all the enhancements alleged in the information to be true. Trujillo was sentenced to a total term of 13 years' imprisonment.

---

[3]Officer Wells testified that the squad room is a large room with two holding cells and a big table with benches that are used to interview suspects.

## *DISCUSSION*

**I.     *Trujillo's admission that she was driving the white truck was properly admitted***

Trujillo argues the trial court should have excluded evidence of her statement to Officer Wells that she was driving the white truck at the time of the accident because Officer Wells did not readvise her of her *Miranda* rights prior to questioning her.  The People respond the trial court did not err because the statement was reasonably contemporaneous with Trujillo's prior waiver of rights in response to Officer Whisenhunt's *Miranda* advisement, and, hence, no readvisement was required.  We agree there was no error.

### A.     *Background*

The trial court held a hearing pursuant to Evidence Code section 402 to ascertain the facts relevant to Trujillo's admission to Officer Wells that she was driving the white truck.  Officer Wells testified at the hearing.  He stated that he asked Trujillo whether she was the driver simply to confirm that he was interviewing the correct person, not to establish that she was in fact the driver of the white truck.  He was acting on the assumption that her status as the driver was already established, as demonstrated by the fact she was under arrest.  Thus, once he confirmed Trujillo was the driver, he advised her of her rights under *Miranda* and proceeded to interview her about "the details of the crash."  He could not recall whether Officer Whisenhunt had told him he had previously advised Trujillo regarding her *Miranda* rights in his patrol car.

The trial court summarized the issue before it as follows:

> "What I'm dealing with here is I think a fair inference based on all the testimony that we've heard here in this trial is that Officer Whisenhunt, in fact, Mirandized the defendant and that she waived at [Kern Medical Center] before they ever entered the squad room.  So what I'm dealing with here is a circumstance where you have a new officer coming in after Miranda has already been—after the defendant has already consented to talking.  [¶]  He asks a question before he Mirandized her again, which seems to be redundant to me but I'm willing to listen to argument on that

8.

point and find out what—if there's a basis for [a] Miranda type objection here, I'm certainly willing to listen to it."

The defense argued that Trujillo's admission that she was the driver was extremely incriminating and should be excluded because, in light of her inebriation and disorientation, her *Miranda* waiver was not knowing and intelligent. The prosecution conceded that *Miranda* applied because Trujillo's admission was incriminating and obtained in a custodial setting, but argued the prior waiver was valid and reasonably contemporaneous with Officer Wells's questioning. The prosecution pointed out that Officer Whisenhunt obtained Trujillo's *Miranda* waiver well after 1:15 a.m., when her blood was drawn at Kern Medical Center, and Officer Wells questioned her sometime before 4:30 a.m., when she was booked into jail. The prosecution concluded that Officer Wells interviewed Trujillo about "30 to 40 minutes" after she waived her rights while seated in Officer Whisenhunt's patrol car.

The prosecution further argued that there was no question Trujillo's prior waiver was knowing and intelligent. She had been calm and communicated effectively with staff at Kern Medical Center; Officer Whisenhunt obtained the waiver well after the accident when she had regained her composure; she was responsive and readily answered Officer Whisenhunt's questions; she was cooperative throughout the investigative process; and she had prior experience with law enforcement.[4] The defense responded that any appearance of cooperation should be discounted because Trujillo was inebriated and her exchanges with the officers were very brief.

The court ruled that Officer Wells's testimony regarding Trujillo's statement that she was the driver of the white truck was admissible. The court reasoned as follows:

> "The point that causes this Court trouble is the fact that—are the facts of the intoxication and the level of intoxication and the fact it was a different officer. Those are the two facts that bother me the most.

---

[4]Trujillo had a prior 2010 misdemeanor conviction pursuant to section 647, subdivision (f), for being drunk in public.

"On the other hand, the only information I have as we consider what does a .26 mean is some general testimony from what I consider to be an experienced officer but ultimately I have no information, no factual information in front of me. Both counsel have talked about—we've talked about height, weight, on the one hand. We've talked about youth. We've also talked about a prior 647(f), and frankly none of that tells me anything.

"It doesn't tell me anything about a person's experience with Miranda. It doesn't tell me anything about a person's experience with alcohol so the .26, I don't know. I don't know. I don't have any facts in front of me that say that at a .26, she couldn't do cartwheels. I just don't know. I know what Officer Whisenhunt described at the scene. Then I know what he described at [Kern Medical Center], a seemingly different person and in a different state of mind.

"I think the proximity of the Miranda warnings and I think [the prosecutor] probably has a—I think I'm more inclined to go along with his timeline here. It certainly was less than two hours, probably a lot less than that even [giving] defendant the benefit of the doubt on this. So I'll allow the testimony to stand."

### B.    *Analysis*

Trujillo argues the admission of her statement to Officer Wells violated *Miranda* because the questioning by Officer Wells at the police station was not reasonably contemporaneous with her prior waiver. She contends the trial court's error was not harmless beyond a reasonable doubt and, hence, the judgment should be reversed. The People respond that Officer Wells's questioning was reasonably contemporaneous with the prior advisement and waiver of rights, and that, in any event, any error is harmless beyond a reasonable doubt.

*Miranda v. Arizona*, *supra*, 384 U.S. 436, held that a defendant's statements made during a custodial interrogation are admissible against him only if he knowingly and intelligently waived his rights to remain silent and to the presence and assistance of counsel. (*People v. Cruz* (2008) 44 Cal.4th 636, 667.) "The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was

10.

'made with a full awareness of both the nature of right being abandoned and the consequences of the decision to abandon it.' [Citation]." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.) The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 751.)

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation]." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary if the subsequent interrogation is "'reasonably contemporaneous'" with the prior waiver. (*People v. Duff* (2014) 58 Cal.4th 527, 555.) "'The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and "[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights." [Citation].'" (*Ibid.*) In *Duff*, the defendant waived his rights and spoke with one officer, then asked to stop; as the officer was preparing to leave, the defendant asked to speak with a different officer. The second officer appeared 23 minutes later and, after small talk and a bathroom break, questioned the defendant and obtained his confession. (*Id.* at pp. 554-555.) Noting that prior cases had "permitted as 'reasonably contemporaneous' the resumption of interrogation without a readvisement even a day or two after the initial waiver," the Supreme Court found that the second round of questioning in *Duff* was "entirely constitutional notwithstanding the absence of renewed *Miranda* warnings." (*Id.* at p. 555.)

11.

In this case, the trial court properly found that less than two hours, and in all likelihood, significantly less than two hours, had elapsed between the rights waiver obtained by Officer Whisenhunt in his patrol car and the questioning conducted by Officer Wells at the police department. Officer Whisenhunt testified that he left the scene of the accident about 12:30 a.m. or 12:45 a.m. to take Trujillo to Kern Medical Center, which was about a 15- to 20-minute drive away. The officer testified that Trujillo's blood was drawn at 1:15 a.m., shortly after arrival at the hospital, but it took considerably longer for a doctor to examine her and provide a medical clearance. The officer estimated that he and Trujillo remained at Kern Medical Center "anywhere from an hour and a half to two and a half hours" to get the medical clearance from a doctor. Thereafter, the officer placed Trujillo in the back of his patrol car, provided a proper *Miranda* advisement, obtained a waiver, and questioned her very briefly before taking her to the Bakersfield Police Department's squad room. After a brief interview with Officer Wells, Trujillo was booked into the county jail at 4:30 a.m.

According to this timeline, Officer Whisenhunt and Trujillo arrived at Kern Medical Center about 1:00 a.m., and they waited a minimum of an hour and a half, possibly more, for Trujillo to be medically cleared. The *Miranda* advisement and waiver of rights in Officer Whisenhunt's patrol car thus occurred sometime after 2:30 a.m., and Trujillo's interview with Officer Wells, in turn, occurred after Trujillo waived her rights but before she was booked into jail at 4:30 a.m.[5] The evidence therefore supported the trial court's determination that "less than two hours" and "probably a lot less than that" had elapsed between the initial *Miranda* waiver and the questioning conducted by Officer Wells at the police department.

---

[5]At an Evidence Code section 402 hearing held prior to trial, Officer Wells testified that he was called to the scene of the accident at 1:55 a.m. on April 24, 2011, and stayed at the scene for approximately one and a half hours, after which he went to Bakersfield Police Department and interviewed Trujillo.

Based on the totality of the circumstances, Officer Wells's questioning was reasonably contemporaneous with the waiver of rights obtained by Officer Whisenhunt, rendering a further *Miranda* advisement unnecessary. Less than two hours had elapsed between Trujillo's waiver and Officer Wells's questioning, strongly indicating that renewed *Miranda* warnings were not required. (See *People v. Williams* (2010) 49 Cal.4th 405, 435 [interrogation conducted 40 hours after initial advisement and waiver of rights was reasonably contemporaneous].) Furthermore, the closeness in time of the two rounds of questioning and the similar line of questioning employed by both officers suggested that Officer Wells's questioning was part of an "ongoing and cooperative process," which also obviated the need for renewed warnings. (See *People v. Lewis* (2001) 26 Cal.4th 334, 386-387 [readvisement unnecessary where one interrogator obtained waiver of rights and five hours later a second interrogator elicited defendant's confession, because the second interrogation "was part of an ongoing and cooperative process"].) Finally, the fact that Trujillo continuously remained in custody during the relevant period—although she was moved from the back of a patrol car to an interrogation room inside the police department—also militated against the need for renewed warnings as there was no indication her status or rights had changed in any material way. (See *People v. Mickle* (1991) 54 Cal.3d 140, 171 [*Miranda* readvisement unnecessary for re-interview of defendant in hospital because he had waived his rights at stationhouse 36 hours earlier and had remained in official custody for entire duration].)

We also reject Trujillo's suggestion that the prior warning and waiver were not reasonably contemporaneous because she was too intoxicated and too traumatized by the accident to focus on and remember the warning. The trial court could reasonably conclude, based on the record, that Trujillo understood her rights and knowingly agreed to answer the officers' questions and cooperate with the investigation. (See *People v. Stroud* (1969) 273 Cal.App.2d 670, 680 [.229 blood alcohol content, standing alone, "neither proves nor disproves defendant's capacity to understand and rationalize"];

13.

*Matylinsky v. Budge* (9th Cir. 2009) 577 F.3d 1083, 1095 ["an intoxicated individual can give a knowing and voluntary waiver, so long as that waiver is given by his own free will"]; *United States v. Comstock* (9th Cir. 2011) 443 Fed.Appx. 310, 312 [*Miranda* waiver valid despite intoxication when defendant was coherent, responsive, aware of surroundings, and gave detailed confession]; *People v. York* (1980) 108 Cal.App.3d 779, 787 [*Miranda* waiver valid despite suspect's drinking].) In waiving her rights, Trujillo told Officer Whisenhunt that she understood her rights, was "very cooperative," and answered his questions promptly (albeit she could not remember where she was coming from or going to at the time of the accident). Officer Wells testified that, while Trujillo "appeared somewhat intoxicated," she seemed "to be able to understand [him] fine."

In sum, Trujillo's initial valid waiver was "'reasonably contemporaneous'" with the subsequent questioning by Officer Wells, rendering renewed *Miranda* warnings unnecessary. Officer Wells's questioning thus comported with constitutional requirements. Accordingly, the trial court did not err in admitting his testimony regarding Trujillo's admission that she was driving the white truck at the time of the collision.

## II. *The court did not abuse its discretion in denying defense's request for a pre-sentencing diagnostic study pursuant to section 1203.03, subdivision (a)*

Trujillo argues the trial court's rejection of her request for a diagnostic study pursuant to section 1203.03 was sentencing error necessitating reversal. She contends the study was required for determining a just sentence because her offense was alcohol-related, and there was evidence before the court indicating she was an alcoholic. We disagree.

Section 1203.03 provides, in pertinent part, that a court may order the Department of Corrections to conduct a diagnostic evaluation of a defendant if it concludes "diagnosis and treatment services" are essential to the just disposition of the case. (§ 1203.03, subd. (a); *People v. Harris* (1977) 73 Cal.App.3d 76, 85; accord, *People v.*

14.

*Peace* (1980) 107 Cal.App.3d 996, 1001.) The purpose of a diagnostic study is to obtain social and psychological information relevant to sentencing (*People v. Myers* (1984) 157 Cal.App.3d 1162, 1169) and for the Department of Corrections to make a recommendation as to whether "probation or prison" would be the appropriate disposition in the case. (*People v. Nocelotl* (2012) 211 Cal.App.4th 1091, 1093; *People v. Tang* (1997) 54 Cal.App.4th 669, 676.) The trial court exercises broad discretion in determining whether a diagnostic study is warranted. (*People v. Lawrence* (1985) 172 Cal.App.3d 1069, 1075; *People v. Swanson* (1983) 142 Cal.App.3d 104, 110-111.) We review the trial court's decision regarding the propriety of a diagnostic study for abuse of discretion. (*Peace*, *supra*, at p. 1002.) The court's determination will be upheld unless it exceeds the bounds of reason. (*Ibid*.)

Trujillo has not shown the court abused its discretion in declining to order a diagnostic evaluation. The court noted in a preliminary assessment that probation was not a suitable sentencing option given the severity of the victims' injuries and the fact that Trujillo knew she was "on a bad path" with regard to her drinking.[6] Furthermore, the court had ample information regarding Trujillo's alcohol problem and her efforts to control it. Trujillo's alcohol problem was reflected in the facts of the offense, in her sentencing statement and its attachments, and in the probation report. Her sentencing statement included records related to her rehabilitation efforts as well as numerous letters from family, friends, and coworkers outlining her social history. The probation report

---

[6]The court stated: "This is a very difficult case for me to deal with. It troubles me that we're dealing with such horrendous injuries and that's my first concern. It troubles me that I'm dealing with a young lady who just made—exercised horrendously bad judgment. But fundamentally, it's not a case where—ultimately where the defendant had no warning that she was on a bad path. And the purpose of the 1203.03 would be to determine whether or not she could function successfully on probation as I understand it. And although I disagree with the People, that she's statutorily ineligible for probation, I do not find that probation is suitable in this case. So I'm going to deny the 1203.03 request and we're gonna proceed with sentencing."

documented Trujillo's public-intoxication conviction from 2010 and revealed that she had attended 30 Alcoholics Anonymous meetings as a condition of probation. The court also heard testimony from a correctional counselor at the Department of Corrections regarding the scope of a diagnostic evaluation conducted pursuant to section 1203.03.

In light of the information before it, the court reasonably could have concluded that further "diagnosis and treatment services" were not necessary for a just disposition of the case. (Section 1203.03, subd. (a); see *People v. Swanson*, *supra,* 142 Cal.App.3d at p. 111 [where court had great deal of information regarding defendant's alcohol problem, it did not abuse its discretion in refusing to order diagnostic study].) The trial court also could reasonably have determined that a diagnostic evaluation, as described by the correctional counselor, would not affect the outcome of the case. (See *People v. Lawrence, supra,* 172 Cal.App.3d at p. 1075 [trial court properly rejected request for diagnostic study as superfluous given court's conclusion that state prison was appropriate disposition].) Hence, it was not an abuse of discretion for the court to decline to order an evaluation.

### III. *The court did not abuse its discretion in denying defense's requests for probation and to strike one or more great-bodily-injury enhancements*

In sentencing Trujillo, the trial court considered a range of applicable factors but ultimately adopted the recommendation set forth in the probation report. Accordingly, the court imposed a sentence of 13 years' imprisonment on count 1 and its applicable enhancements and stayed an identical sentence on count 2 and its applicable enhancements. Trujillo argues the trial court abused its discretion in denying probation or, alternatively, in not dismissing or striking one or more of the great-bodily-injury enhancements the jury found to be true.

#### A. *Trial court's denial of probation*

"Probation is generally reserved for convicted criminals whose conditional release into society poses minimal risk to public safety and promotes rehabilitation." (*People v.*

*Welch* (1993) 5 Cal.4th 228, 233; § 1202.7.) "'[It] is an act of clemency which rests within the discretion of the trial court, whose order granting or denying probation will not be disturbed on appeal unless there has been an abuse of discretion.'" (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831; *People v. Lai* (2006) 138 Cal.App.4th 1227, 1256 [trial court has broad discretion in evaluating factors in aggravation and mitigation to determine whether eligible defendant is suitable for probation]; § 1203, subd. (b); Cal. Rules of Court, rule 4.414.)

To establish abuse of discretion, Trujillo must show the denial of probation was arbitrary or capricious under the circumstances. (*Du, supra*, 5 Cal.App.4th at p. 831.) She argues the trial court abused its discretion in denying probation because she was a youthful offender without any significant criminal history, was gainfully employed, had strong community ties, and had voluntarily sought treatment for her alcoholism (which had led her to commit the instant offense). At the sentencing hearing, the defense had asked for probation based on the same factors, arguing Trujillo was a good person who had made a bad mistake and was genuinely remorseful for her actions. In contrast, the probation officer concluded probation was not warranted in light of the severity of the victims' injuries and Trujillo's extremely high BAC. The prosecution, for its part, argued Trujillo was statutorily ineligible for probation and asked the court to impose a sentence of 15 years' imprisonment. The court also heard the testimony of several witnesses at the sentencing hearing, including the sister of one of the victims, as well as a number of Trujillo's family members.

Although the court concluded Trujillo was eligible for probation, it ultimately adopted the recommendation of the probation officer and sentenced Trujillo to the middle term of two years for the offense, along with additional terms for the applicable enhancements, for a total term of 13 years' imprisonment. The court noted it had read and considered the sentencing statements from both parties, as well as the probation report; taken into account the testimony of the witnesses; and weighed a range of

mitigating and aggravating factors. The court also noted it was guided by Vehicle Code section 23578, which permits the court, in sentencing a defendant convicted under Vehicle Code section 23153, to consider a blood alcohol concentration of 0.15 percent or more as a special factor that may support enhanced penalties and affect the propriety of probation.[7] The court concluded a prison sentence was warranted in light of, inter alia, the severity of the victims' injuries and the fact that Trujillo had notice of her drinking problem.[8] We see nothing arbitrary or capricious in the trial court's decision to deny probation and sentence Trujillo to prison. Accordingly, we find no abuse of discretion.

### B. Trujillo's request to strike one or more of the applicable great-bodily-injury enhancements

Trujillo argues the trial court abused its discretion in failing to dismiss or strike any of the great-bodily-injury enhancements alleged in the information and found to be true by the jury. We disagree.

The information alleged six identical enhancements with respect to each count: two enhancements pursuant to Vehicle Code section 23558 (causing bodily injury to more than one person); one enhancement pursuant to section 12022.7, subdivision (b) (causing great bodily injury resulting in a victim becoming comatose); and three enhancements pursuant to section 12022.7, subdivision (a) (causing great bodily injury to an individual). Trujillo's base sentence of two years on count 1 was enhanced by five

---

[7]Vehicle Code section 23578 provides as follows: "In addition to any other provision of this code, if a person is convicted of a violation of Section 23152 or 23153, the court shall consider a concentration of alcohol in the person's blood of 0.15 percent or more, by weight, or the refusal of the person to take a chemical test, as a special factor that may justify enhancing the penalties in sentencing, in determining whether to grant probation, and, if probation is granted, in determining additional or enhanced terms and conditions of probation."

[8]The probation report noted that Trujillo was convicted of public intoxication in 2010, was on probation for that offense when she committed the instant offense, and had attended 30 Alcoholics Anonymous meetings as a condition of probation.

years for causing great bodily injury resulting in a victim becoming comatose.  She also received two additional three-year terms, each based on a separate enhancement for causing great bodily injury.  In total, she was sentenced to 13 years on count 1.  Her sentence for the remaining three enhancements related to count 1 was stayed; her sentence for count 2 and all related enhancements was also stayed.

Section 1385, subdivision (a), authorizes a trial court to dismiss sentencing enhancements, among other things, if the dismissal is "in the furtherance of justice."  (*In re Varnell* (2003) 30 Cal.4th 1132, 1136; *People v. Thomas* (1992) 4 Cal.4th 206, 210; *People v. Rivas* (2004) 119 Cal.App.4th 565, 571.)  However, the trial court's power under section 1385, "while broad, is by no means absolute."  (*People v. Orin* (1975) 13 Cal.3d 937, 945.)  Any dismissal must be in furtherance of justice, which "'requires consideration both of the constitutional rights of the defendant'" and "'*the interests of society represented by the People* ….'"  (*Ibid.*)  Further, in exercising its discretion under section 1385, "the court should consider the nature and circumstances of the defendant's current crimes, the defendant's prior convictions, and the particulars of his or her background, character, and prospects.  [Citation]."  (*People v. Orabuena* (2004) 116 Cal.App.4th 84, 99.)

We review the trial court's denial of relief under section 1385 for abuse of discretion.  (*People v. Orabuena*, *supra*, 116 Cal.App.4th at p. 99; *People v. Lee* (2008) 161 Cal.App.4th 124, 131-132.)  The trial court is presumed to have acted to achieve legitimate sentencing objectives.  (*People v. Lee*, *supra*, at pp. 131-132.)  However, abuse of discretion may be shown where the court was not aware of the scope of its discretion pursuant to section 1385, considered impermissible factors in exercising its power to strike or dismiss an enhancement, or acted so irrationally or arbitrarily that no reasonable person could agree with its denial of relief under section 1385.  (*People v. Lee, supra,* at p. 132; *People v. Orabuena*, *supra*, at pp. 99-100.)

19.

Here, Trujillo asserts the court abused its discretion by not striking one or more enhancements because the instant offense was nonviolent, Trujillo was only 23 years old at the time of the offense, she had been gainfully employed in the records department at North Kern State Prison since 2007, she was addressing her alcoholism through treatment, she was of good character and had strong community ties, and the sentence she received was extremely harsh because multiple enhancements (based on the fact that three victims were injured in the crash) added 11 years to her sentence for a single substantive offense.

Contrary to Trujillo's assertion, her offense constituted a violent felony pursuant to section 667.5, subdivision (c)(8). (*People v. Arndt* (1999) 76 Cal.App.4th 387, 396 [running a stop light while driving under the influence and inflicting great bodily injury on three people undoubtedly constituted violent crime].) Moreover, a defendant may properly be punished more severely for causing injury to multiple persons rather than to only one person. (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 352 [sentencing enhancements may appropriately be used to increase punishment where single act injures more than one person].)

The trial court reviewed Trujillo's sentencing statement and heard defense counsel's related arguments for a mitigated sentence. Ultimately, based on its consideration of a number of appropriate factors, the court declined to exercise its discretion pursuant to section 1385 to strike any applicable enhancement. As there is nothing irrational or arbitrary about the court's sentencing decision, we find no abuse of discretion.

## *<u>DISPOSITION</u>*

The judgment is affirmed.

_____
Smith, J.

WE CONCUR:

_____
Hill, P.J.

_____
Poochigian, J.

21.